NEW CASTLE COUNTY

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation of the State of Connecticut, Home Insurance Company, a corporation of the State of New Hampshire, New Hampshire Insurance Company, a corporation of the State of New Hampshire, Continental Casualty Company, a corporation of the State of Illinois, United States Fire Insurance Company, a corporation of the State of New York, Insurance Company of North America, a corporation of the State of Pennsylvania, Continental Insurance Company, a corporation of the State of New Hampshire, United States Liability Insurance Company, a corporation of the State of Pennsylvania, National Union Fire Insurance Company, a corporation of the Commonwealth of Pennsylvania, Twin City Fire Insurance Company, a corporation of the State of Minnesota, Aetna Casualty and Surety Company, a corporation of the State of Connecticut, and Zurich Insurance Company, a Swiss corporation Continental Casualty Company ("CNA'), Appellant.

Nos. 89–3814, 90–3012 and 90–3030.

United States Court of Appeals,
Third Circuit.

Argued Aug. 28, 1990.

Decided April 30, 1991.

As Amended May 29, 1991.

Arthur Makadon (argued), David L. Cohen, Geoffrey A. Kahn, Walter M. Einhorn, Jr., Gilpin W. Bartels, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., John G. Mulford, Michael J. Goodrick, Theisen, Lank, Mulford and Goldberg, P.A., Wilmington, Del., for CNA, appellant.

Joseph D. Tydings (argued), Jerold Oshinsky, Catherine Serafin Sponseller, Anderson, Kill, Olick & Oshinsky, Washington, D.C., George H. Seitz, III, Prickett, Jones, Elliott, Kristol and Schnee, Wilmington, Del., for New Castle County, appellee.

Clifford B. Hendler (argued), John I. Stewart, Jr., Scott L. Winkelman, William D. Wallace, Crowell & Moring, Dennis M. Flannery, A. Stephen Hut, Jr., Wilmer, Cutler & Pickering, Washington, D.C., for Insurance Co. of North America, appellee.

William J. Cattie, III, Heckler & Cattie, Wilmington, Del., Edward B. Deutsch, Laurence M. McHeffey, Loren L. Pierce, McElroy, Deutsch & Mulvaney, Morristown, N.J., for U.S. Fire Ins. Co., appellee.

Gary W. Aber, Heiman, Aber & Goldlust, Wilmington, Del., James E. Rocap, III, Thomas B. Carr, D. Bradley Clements, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Aetna Cas. & Sur. Co., appellees.

Dennis D. Ferri, Michael A. Pedicone, Dennis D. Ferri, P.A., Wilmington, Del., Philip A. Ryan, German, Gallagher & Murtagh, Philadelphia, Pa., for U.S. Liability Ins. Co., appellee.

Norman M. Monhait, Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del., Roger E. Warin, Virginia L. White–Mahaffey, Anita G. Raby, Janet W. Steverson–Wright, Steptoe & Johnson, Washington, D.C., for The Home Ins. Co., appellee.

Alfred J. Kuffler, Michael B. McCauley, Stephen M. Calder, Kevin G. O'Donovan, David R. Kunz, Palmer, Biezup & Henderson, Philadelphia, Pa., for John Richard Ludbrooke Youell, amicus curiae.

Charles M. Oberly, III, Atty. Gen., State of Del., Robert S. Kuehl, Stuart B. Drowos, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for State of Del., amicus curiae.

Ernest D. Preate, Jr., Atty. Gen., Com. of Pa., Harrisburg, Pa., for Commonwealth of Pa., amicus curiae.

Bert W. Rein, Thomas W. Brunner, Sharon Rau Dissinger, Wiley, Rein & Fielding, Washington, D.C., for Insurance Environmental Litigation Ass'n, amicus curiae.

William H. Allen, William F. Greaney, Martin Wald, Covington & Burling, Washington, D.C., for E.I. du Pont de Nemours & Co., ICI Americas, Inc., Intern. Business Machines Corp., Olin Corp., The American Petroleum Institute, and The Chemical Mfrs. Ass'n, amici curiae.

Before BECKER and NYGAARD, Circuit Judges, and RE, Chief Judge, Court of International Trade.*

* The Honorable Edward D. Re, Chief Judge of the Court of International Trade, sitting by designation.

OPINION OF THE COURT

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | Introduction | 1166 |
| II. | Facts and Procedural History | 1169 |
| | A. Pre–Operation Events | 1170 |
| | B. The County's Operation of the Tybouts Corner Landfill | 1171 |
| | C. Post–Operation Events | 1171 |
| | D. The Three Underlying Lawsuits Against the County | 1173 |
| | E. The Insurance Coverage Litigation | 1173 |
| | F. The Significant Post–Trial Events | 1174 |
| III. | Appellate Jurisdiction | 1176 |
| | A. Appeal Number 89–3814 | 1176 |
| | 1. The Rule 59(e) Versus Rule 60(b) Issue | 1176 |
| | 2. The Jurisdictional Effect of CNA's Cross–Claims | 1177 |
| | B. Appeal Number 90–3030 | 1179 |
| IV. | The Insurance Coverage Issues | 1180 |
| | A. Preliminary Matters | 1180 |
| | 1. CNA's Contracts of Insurance | 1180 |
| | 2. The Burden of Proof in Insurance Cases | 1181 |
| | 3. The Interpretation of Insurance Policies Under Delaware Law | 1182 |
| | 4. The Issues on Appeal | 1183 |
| | 5. Our Scope of Review | 1183 |
| | B. The "As Damages" Clause | 1184 |
| | 1. Background | 1184 |
| | 2. CNA's Contentions on Appeal | 1185 |
| | 3. The County's Response | 1187 |
| | 4. Legal, Technical Meaning or Plain, Ordinary Meaning? | 1188 |
| | C. The "Occurrence" Clause | 1191 |
| | D. The "Pollution Exclusion" Clause | 1192 |
| | 1. The Meaning of the Word "Sudden" | 1193 |
| | a. The significance of multiple dictionary definitions | 1193 |
| | b. The rule that all words in a policy should be given effect | 1194 |
| | c. The existence of judicial disagreement | 1195 |
| | d. The drafting and marketing history of the pollution exclusion clause | 1196 |
| | e. Conclusion | 1198 |
| | 2. The Damage/Discharge Distinction | 1199 |
| | a. The case law | 1200 |
| | b. The history of the pollution exclusion: does it shed any light on the import of the damage/discharge distinction? | 1201 |
| | c. The economic rationale underlying the damage/discharge distinction | 1202 |
| | d. Evidence suggesting that the discharge of leachate from Tybouts Corner was not unexpected | 1202 |
| | e. Conclusion | 1203 |
| V. | CNA's Cross–Claims | 1203 |
| | A. The Timeliness of CNA's Cross–Claims Under the Parties' February 1986 Stipulation | 1203 |
| | B. The "Settlement Bar" Issue | 1205 |
| VI. | Conclusion | 1207 |

BECKER, Circuit Judge.

## I. INTRODUCTION

These consolidated appeals present important questions about the meaning of the "pollution exclusion" and "as damages" clauses found in post–1970 comprehensive general liability ("CGL") insurance policies. These issues frequently recur in cases involving insurance coverage of environmental damage caused by the discharge of pollutants—a genre of litigation that has become a staple of many federal courts' dockets.

The standard CGL policy provides coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage ... caused by an occurrence."[1] An "occurrence" is an "accident" that, during the policy period, results in damage "neither expected nor intended from the standpoint of the insured." The standard CGL policy also contains an exclusionary clause, known as the "pollution exclusion," which disclaims coverage "for bodily injury or property damage arising out of the discharge, dispersal, release or escape" of pollutants. This exclusion, however, is not absolute; it contains an exception providing for coverage where the bodily injury or property damage results from a "discharge" of pollutants that is "sudden and accidental."

These appeals arise from a declaratory judgment action brought in 1985 by New Castle County, Delaware (the "County") in the district court for the District of Delaware against twelve insurance companies that had issued CGL policies to the Coun-

ty.[2] The County sought a declaration of the carriers' duties under their respective policies to defend and indemnify it in three underlying lawsuits. These suits originated from the County's operation of and the discharge of pollutants from the Tybouts Corner landfill, which served from 1969 until 1971 as the County's primary location for the disposal of solid wastes. The three underlying lawsuits allege, in essence, that the landfill has poisoned local residents' drinking water.

When the Llangollen landfill, which the County had used as its municipal waste disposal site since 1960, neared its capacity in 1968, the County, after some preliminary investigation, concluded that a sanitary landfill remained the best means available to dispose of solid waste materials and chose Tybouts Corner as the successor site. This location was selected due to its proximity to the County's population center, the potential for land reclamation, and the prospects for long-term use. County officials also predicted that the operation of a landfill at Tybouts Corner would have minimal environmental impact.[3]

Little was known in 1968 about the environmental danger posed by sanitary landfills. At that time, the primary concerns raised by landfills were "direct-contact environmental problems"—i.e., "vectors, such as rodents and seagulls, blowing paper, odors, and keeping the waste covered."[4] Few then recognized the extent to which landfills above the water table threaten to pollute the underlying aquifers through the discharge of "leachate."[5] By 1985, how-

---

1. The controlling language of the standard-form CGL policies issued to the appellee New Castle County is quoted *in toto* in Part IV.A.1. of this opinion. *See infra* at 1180–1181.

2. Jurisdiction was founded on diversity of citizenship, 28 U.S.C. § 1332.

3. The property at Tybouts Corner was owned by William and Elizabeth Ward. Because the Wards had an ongoing sand and gravel excavation business on the site, and hence did not wish to sell the Tybouts Corner property, the County leased the land from the Wards for a period of five years, commencing on January 1, 1969. Under the lease, the Wards agreed to operate the landfill in accordance with applicable laws and regulations.

4. *New Castle County v. Continental Casualty Co.,* 725 F.Supp. 800, 804 (D.Del.1989).

5. The district court defined "leachate" as " '[a]n aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, underlying mineral strata, or other materials.' " 725 F.Supp. at 803 n. 4 (quoting 2 *International Dictionary of Medicine and Biology* 1533 (1986)). In 1968, only one study existed concerning landfill leachate. Although experts generally understood that wastes should be stored above the seasonal high water mark, they mistakenly believed that landfills naturally purified themselves through a process of soil filtration.

ever, leachate emanating from Tybouts Corner and allegedly contaminating neighboring drinking wells had become a multimillion dollar headache for the County, prompting the County to turn to its insurance carriers for financial relief.

In response to the County's declaratory judgment action, the insurers raised a number of different defenses based on the terms and exclusions of their policies and on the facts and circumstances of the County's management of the Tybouts Corner landfill. After extensive discovery, the district court issued two decisions denying defendants' motions for summary judgment.

On November 2, 1987, the district court filed an opinion in which it rejected defendants' argument that the "sudden and accidental" exception to the "pollution exclusion" clause only applies to damage resulting from an "abrupt" or "brief" discharge of pollutants. *See New Castle County v. Hartford Accident & Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987) (*"New Castle I"*). The district court concluded that the meaning of the word "sudden" is ambiguous and, in accordance with Delaware insurance law, resolved this ambiguity in favor of the insured, defining "sudden" to mean "unexpected," not "abrupt." In the same opinion, the district court also rejected the insurers' argument that the "as damages" clause covers only liability imposed through legal (as opposed to equitable) actions. The court determined that "damages," as ordinarily defined, may arise from either legal or equitable actions, and that therefore the three underlying lawsuits against the County, seeking, *inter alia*, to compel the County to clean up the pollution from the Tybouts Corner landfill, are covered by the CGL policies.

On March 31, 1988, the district court disposed of the remaining aspects of defendants' summary judgment motions adversely to them. *See New Castle County v. Hartford Accident & Indemnity Co.*, 685 F.Supp. 1321 (D.Del.1988) (*"New Castle II"*). In particular, the district court rejected defendants' claim that the groundwater pollution arising out of the discharge of leachate from the Tybouts Corner landfill did not, as a matter of law, constitute an "occurrence" under the policies. The court held, rather, that there were genuine issues of material fact concerning the scope of the policies' coverage that necessitated a trial.

During the four years of litigation preceding trial, all of the insurance carriers except Continental Casualty Company ("CNA") settled with the County and were dismissed from the case. On October 23, 1989, following a seven-day bench trial, the district court issued its "Final Judgment and Order." *See New Castle County v. Continental Casualty Co.*, 725 F.Supp. 800 (D.Del.1989) (*"New Castle III"*). This order set forth in detail the district court's factual findings and conclusions of law. The court held, specifically, that covered "occurrences" took place during each of CNA's two policy periods, which ran from August 1, 1973, through January 1, 1975, inclusive. The court therefore imposed on CNA the duty to defend and indemnify the County in the three underlying lawsuits.

These appeals followed. CNA claims that the district court erred in holding: (1) that the pollution exclusion clause does not bar coverage for unexpected property damage caused by a gradual (and perhaps expected) *discharge* of pollutants; (2) that the three underlying lawsuits against the County are covered by the "as damages" clause even though those actions are, in part, equitable in nature; and (3) that the pollution *damage* resulting from the Tybouts Corner landfill was "neither expected nor intended from the standpoint of the insured" and thus constitutes an "occurrence" within the meaning of the policies. These issues are quite difficult and highly contentious, as evidenced by the numerous cases raising similar issues that in recent years have been vigorously litigated in state and federal courts throughout the nation. Our task is made more difficult because we must predict how the Delaware Supreme Court would resolve these perplexing issues, which are all questions of first impression under Delaware law.

Based on our reading of the "as damages" and "occurrence" clauses, we conclude that the three lawsuits against the County are included within the basic coverage provisions of CNA's CGL policies. We think that the common, everyday meaning

of the word "damages" encompasses liabilities arising from both actions at law and actions in equity. Thus, we conclude that the County's liability for the cost of repairing property damage caused by pollution from Tybouts Corner landfill constitutes "damages." We acknowledge that CNA's narrower, technical definition of "damages" is a reasonable one, but the existence of alternative interpretations merely creates an ambiguity, which, under Delaware law, is construed against the insurer. We also agree with the district court's conclusion that damage is "expected" within the meaning of the "occurrence" clause if there is a "substantial probability" of damage before the policy period begins. And we think that the district court's factual finding that there was not a substantial probability of pollution damage from Tybouts Corner when CNA issued its first policy to the County is not clearly erroneous.

We next analyze whether the policies' pollution exclusion clause takes away the coverage that the above provisions provide. After examining various dictionary definitions, surveying the vast array of conflicting case law, and reviewing the drafting history of the pollution exclusion clause, we agree with the district court that the word "sudden" is ambiguous and thus should be interpreted as meaning "unexpected." Notwithstanding this general agreement as to the interpretation of the word "sudden," we are unable to affirm the district court's decision that the pollution exclusion clause does not bar coverage here.

By its own terms, the pollution exclusion clause forecloses coverage for damage caused by the discharge of pollutants, unless "such *discharge*, dispersal, release or escape is sudden and accidental." However, in holding that the County's claim fits within the "sudden and accidental" exception, the district court focused on whether the pollution *damage* was sudden and accidental. We think that the court, as the plain language of the pollution exclusion clause suggests, should have inquired whether the *discharge* of the pollutants from Tybouts Corner was both sudden and accidental. Based on our reading of the record facts, we believe that this shift of focus from damage to discharge may change the outcome of this case.

We therefore will reverse the district court's judgment and remand so that the district court may reconsider its treatment of the damage/discharge distinction. The district court should revisit the record and attempt to determine whether the discharge of pollutants from the Tybouts Corner landfill was unexpected and unintended. The court also may receive additional testimony in order to supplement the existing record, if this proves necessary.

Unfortunately, the foregoing summary does not exhaust the issues that must be addressed herein, for a number of other knotty questions are posed by these appeals. This opinion additionally considers: (1) whether we have appellate jurisdiction; (2) whether the district court erred in dismissing as untimely cross-claims filed by CNA against five co-defendant insurers that had settled with the County; and (3) whether the five co-defendant insurers, in the absence of a cross-appeal, can raise their settlements with the County as a bar to CNA's cross-claims. We first address the questions of appellate jurisdiction. Although resolution of the jurisdictional issues necessitates reference to the dispute over the validity of CNA's cross-claims, we defer discussion of that issue until the end of the opinion.

## II. FACTS AND PROCEDURAL HISTORY

A detailed recitation of the relevant facts is set forth in the district court's opinion in *New Castle III. See* 725 F.Supp. at 803–09. We are bound by these factual findings insofar as they are not clearly erroneous. *See Ram Construction Co. v. American States Insurance Co.*, 749 F.2d 1049, 1053 (3d Cir.1984). Our account of the facts, therefore, is rescribed largely from the discussion of the facts in *New Castle III.* We have, however, supplemented the facts detailed in *New Castle III* where necessary to provide a full understanding of the issues presented by these appeals.

The following factual discourse is informed by two related questions: (1)

whether from the County's perspective there was a "substantial probability," prior to May, 1972, that the operation of a sanitary landfill at Tybouts Corner would cause off-site property damage; and (2) whether the discharge of waste materials and other pollutants from Tybouts Corner landfill (as opposed to any resulting environmental damage) was unexpected and unintended.

### A. Pre–Operation Events

As a prerequisite to operating a sanitary landfill at Tybouts Corner, the State of Delaware required the County in 1968 to comply with the permit requirements of the Delaware State Board of Health ("Board of Health") and the Delaware State Water and Air Resources Committee ("WARC"). The County also agreed to comply with the terms of a "rough draft" of proposed regulations promulgated by the Board of Health. In attempting to comply with the permit requirements and proposed regulations, the County consulted with several experts, including state officials and scientists from the University of Delaware, and conducted numerous tests. The County depended on these outside experts to provide the environmental expertise that it lacked.

The State's permit process required an extensive investigation of the proposed landfill site. The County made two sets of test borings to explore the composition of the land around Tybouts Corner. Soil profiles derived from these boring samples showed a low permeability clay layer beneath Tybouts Corner. This clay layer was critical, because it was supposed to ensure that water passing through the landfill flowed laterally, rather than downward into the aquifer. CNA asserts that the County conducted insufficient tests to determine whether a subsurface, continuous clay barrier existed. CNA notes that, before Tybouts Corner opened, the County's own expert, Clarence Turner, had advised the County that his preliminary tests were inconclusive, and that he could not make a definitive determination without further testing. CNA points out that the County neither conducted the additional testing nor forwarded Turner's report to the State.

The County downplays the significance of the Turner report, contending that this "report" was merely a letter soliciting additional work.

The State also required two feet of separation between the deepest point of the landfill and the "anticipated high groundwater elevation." It was believed that this soil separation would act as a "natural filter," purifying the water from precipitation that percolated through the garbage in the landfill. At a meeting on December 9, 1968, the University of Delaware and state officials agreed that the groundwater at Tybouts Corner probably would rise about one foot above the level indicated by the test borings. CNA thus argues that the method used by the County to maintain the required two-foot separation between the refuse and groundwater—digging to the *current* water table and then backfilling two feet—plainly was inadequate. CNA maintains that, in relying on this method (which the district court described as "suspect," 725 F.Supp. at 814), the County could expect only a one foot separation after the water level rose.

In addition to the aforementioned requirements, the State required the County to maintain three wash ponds on the site, to test surface and subsurface groundwater, and to obtain permission prior to dumping chemical or toxic wastes. The State further prohibited the County from depositing wastes within 1000 feet of nearby Red Lion Creek. In connection with the permit process, the County submitted to the State "a plan of operations, topographical maps, construction plans, soils boring dates, soils laboratory reports, soils profiles, and a contract for operating the site." *Id.* at 805. Based on this information, and after a public hearing at which local residents aired their concern over possible pollution, the County received formal approval to operate a sanitary landfill at Tybouts Corner from the WARC on December 9, 1968, and from the Board of Health on December 23, 1968. The Board of Health specifically concluded that Tybouts Corner was "reasonably suitable for use as a landfill." [6] These approv-

---

6. *See also id.* at 805–06 ("CNA's expert witness, who was the State Director of the Division of

als permitted the County to operate a landfill at Tybouts Corner for one year.[7]

### B. The County's Operation of the Tybouts Corner Landfill

The Tybouts Corner landfill began receiving wastes on or about January 1, 1969. On appeal, the parties dwell on only two aspects of the landfill's two-year operation: (1) the reports of the University of Delaware chronicling the gradual process of leachate migration from Tybouts Corner; and (2) CNA's allegation that the County routinely allowed chemical wastes to be dumped at the landfill without first procuring permission from the appropriate agencies.

The University of Delaware, under a contract with the County, monitored the quality of groundwater at Tybouts Corner and regularly prepared reports for the State and the County. Soon after the landfill became operational, a "slight deterioration" of the wells at Tybouts was noticed. The University, however, consistently reported that the level of contamination was "far below levels that normally constitute pollution." From 1969 to 1971, the University's reports depicted a progressive degradation of the groundwater, but concluded that, although water quality was changing, there was no significant pollution. The University's report of May 14, 1971, was typical in this regard:

> In summary, there are definite indications of groundwater deterioration from landfill leachate under the landfill site. There has also been deterioration in the quality of the wash pond water as would be expected since the ponds are inter-connected, have been subject to dumping

and filling, and are the recipients of much of the landfill site surface runoff. However, to date, samples taken from Red Lion Creek and Pigeon Run have not indicated any measurable deterioration due to the landfill operation.

App. at 3070. The Board of Health and the WARC, under the permits they had issued to the County, also inspected the Tybouts Corner landfill on a regular basis.[8] These organizations similarly found no signs of serious contamination and thus renewed the County's permits when they expired after one year.

CNA vigorously asserts that the County, throughout the operation of the Tybouts Corner landfill, disregarded express limitations on the dumping of chemical wastes. The permits issued by the Board of Health and the WARC prohibited the dumping of chemical, toxic, and industrial wastes without prior written approval.[9] At trial, CNA called as witnesses a waste hauler, an on-site County supervisor, the owner of the landfill site (William Ward), and one of Ward's employees, all of whom testified that chemical wastes routinely were dumped at Tybouts. The County, CNA claims, never received permission from the Board of Health or the WARC to dump chemical wastes.[10]

### C. Post–Operation Events

The contamination problem at Tybouts Corner became evident shortly after the landfill stopped receiving wastes on July 8, 1971. Three post-operation episodes (at least with the benefit of hindsight) foreshadowed the leachate problem that would

---

Solid Waste at the time Tybouts Corner was selected as a landfill and began operating, testified that, 'I didn't anticipate any problems. I thought it would be a model landfill all around.' ").

**7.** Tybouts Corner was the first Delaware landfill licensed to operate pursuant to the State's permitting procedure.

**8.** The State primarily was concerned with proper compaction and daily cover of the refuse. The permits issued by the Board of Health and the WARC required that six inches of daily cover be applied to the trash in order to ensure that the deposits were not exposed.

**9.** The State's concern with "hazardous" wastes, however, was over fires, explosions, and cave-ins—not groundwater contamination. *See* 725 F.Supp. *id.* at 804 ("Delaware regulation of hazardous waste was directed at 'acute features ... if you touch them, you get burned or they blow up....' ").

**10.** The district court ultimately concluded in *New Castle III* that evidence of chemical dumping was irrelevant to this dispute, because CNA had failed to introduce evidence that the depositing of chemical wastes increased the probability of property damage from landfill leachate. *See id.* at 814.

soon besiege Tybouts: (1) the "black pond incident;" (2) the discovery of a leachate problem at the Llangollen landfill; and (3) the "Winterim" report.

The same month that the Tybouts Corner landfill reached its capacity and was closed, one of the wash ponds on the site turned black, and leachate "seeps" were spotted throughout the property surrounding the landfill and along adjoining roads. These incidents prompted the University of Delaware to report in August of 1971 that "the problem at Tybouts Corner sanitary landfill did not appear to be under control." App. at 3071. Four months later, a University professor advised the County that "leachate next to Highway 301 was flowing like a spring." App. at 1313. The district court, however, viewed these events (which, during the course of this litigation, together have become known as the "black pond incident") with far less alarm:

> A wash pond Ward established at a high elevation caused the black pond incident by increasing the water pressure on the underlying trash and accelerating the natural recharging process. The black pond incident did not indicate that Tybouts Corner would eventually pollute the underlying aquifers. In fact, the black pond, and associated surface seepages, indicated the landfill was functioning as expected. The appearance of leachate on the surface, in response to the added water of the Ward operation, indicates that the water is not escaping below, into the water table.

725 F.Supp. *Id.* at 815 (citations omitted).

Early in 1972, four University of Delaware undergraduate students, under the supervision of a University professor, studied several Delaware landfills, including Tybouts Corner, and prepared a report (the "Winterim report"). This report, although devoting only three quarters of a page to Tybouts, depicted a leachate problem at the site: "Leachate from [Tybouts] was seen

seeping over the surface and into a pond. . . . Overflow from this pond is allowed to flow into a nearby stream. Leachate was also seeping through 150–200 feet of undisturbed sediments, and flowing into a ravine." App. at 3091. Based on these findings, and others like them, the Winterim report concluded that "[t]here is imminent danger of groundwater pollution at *all* sites observed in Delaware." App. at 3098 (emphasis added). This report ultimately was sent to the County and became the subject of a local newspaper article on April 1, 1972.

In May of 1972, more than three years after the Llangollen landfill had closed, the County received a letter from the Delaware Department of Natural Resources and Environmental Control ("DNREC") stating that a private well located near the Llangollen landfill was contaminated. The DNREC advised the County that its investigation had indicated that leachate from Llangollen was the most likely source of the pollution.[11] The County on appeal contends that, due to differences in stratigraphy, hydrogeology, and aquifer characteristics between the two landfill sites, Tybouts Corner was significantly safer than Llangollen. The County thus reasons that the discovery of contamination at Llangollen did not necessarily imply that a similar contamination problem would develop at Tybouts Corner.

The County nonetheless hired a private consultant, Edward H. Richardson Associates ("Richardson"), to test for similar pollution at Tybouts Corner. Richardson submitted three reports to the County between March of 1974 and March of 1975. These reports stated that the Tybouts Corner landfill was leaching, but that groundwater deterioration was not yet problematic.[12]

---

11. Also, Robert French of the DNREC informed the County on July 10, 1972, that:

> Based on our recent findings at landfills at Tybouts Corner and Llangollen Estates, we have concluded that all new or modified landfill operations must provide for the collection and treatment of leachate during the construction phase. This section also is essential

for existing landfills, but obviously will require a longer period of time to accomplish. App. at 3079.

12. *See* 725 F.Supp. *id.* at 807 ("Richardson concluded that the effects of pollutants continued to be attenuated by natural processes, and that Tybouts Corner was not an immediate threat to the surrounding environment.").

## D. *The Three Underlying Lawsuits Against the County*

On May 14, 1976, the DNREC notified the County that the well of Sarah Wagner, which was located several hundred feet from the Tybouts Corner landfill, was contaminated. The DNREC stated that its data revealed that the landfill was the probable source of the contaminants. Since 1976, the following three lawsuits have been filed against the County in connection with the alleged contamination resulting from its operation of the Tybouts Corner landfill.

In *United States v. New Castle County*, No. 80–489 (D.Del. filed Oct. 4, 1980) (the *"USA* action"), the Environmental Protection Agency ("EPA") sued the County under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9604, 9606, 9607, 9613. The EPA, which had added Tybouts Corner to its Superfund list, sought to require the County to abate the contamination caused by Tybouts and to pay "response costs"—i.e., the costs of cleaning up the landfill. The *USA* action eventually was settled. Under the terms of the settlement, the County agreed to pay $385,440, during 1984, to install an alternate water supply for residents around the landfill. The County also agreed to pay 35.9% of the total future costs of cleaning up the site. The County's share of the total cleanup costs currently is estimated at $7.18 million. *See* 725 F.Supp. at 809.

In *Wagner v. New Castle County*, No. 82–7008 (Del.Ch. filed Nov. 10, 1982), Sarah Wagner sued the County and other defendants for injunctive relief and damages, alleging that her drinking well was being contaminated by leachate from the Tybouts Corner landfill. Wagner averred that: "The waste which was deposited, dumped or otherwise placed on and into the landfill is creating a leachate that is percolating downward through the soil and is entering the underlying groundwater." App. at 2116.

Finally, in *Andrews v. New Castle County*, No. 84–124 (D.Del. filed Mar. 2, 1984), thirty-nine residents living within a one mile radius of the Tybouts Corner landfill brought a class action against the County and other defendants, contending that the actual and threatened release of pollutants from Tybouts Corner contaminated and threatens to contaminate their drinking water. These plaintiffs seek a permanent injunction against defendants' continued discharge of pollutants into the groundwater, as well as compensatory and punitive damages.

## E. *The Insurance Coverage Litigation*

Faced with the prospect of substantial liability, the County turned to its insurance carriers to defend and indemnify it in the foregoing suits.[13] When the twelve insurance carriers that had issued CGL policies to the County refused to provide coverage, the County filed the present action for declaratory judgment.[14] The County sought a declaration of these insurers' obligations to defend and indemnify it in the three actions arising from the Tybouts Corner landfill and in two actions that concerned

**13.** The twelve defendant insurance carriers are CNA, U.S. Fire Insurance Company, U.S. Liability Insurance Company, Aetna Casualty & Surety Company, Hartford Accident & Indemnity Company, Twin City Fire Insurance Company, Home Insurance Company, Insurance Company of North America, National Union Fire Company, Continental Insurance Company, Zurich Insurance Company, and New Hampshire Insurance Company.

**14.** This case began, more accurately, as two separate lawsuits. In May of 1985, the Hartford Accident and Indemnity Company ("Hartford"), brought a declaratory judgment action in the District of Delaware against the County and six insurers. Hartford sought a declaration that either (1) it was not obligated to defend and indemnify the County, or (2) if it was so obligated, it had a right to contribution from the six defendant insurers. Later that same year, the County commenced the instant action in Delaware Superior Court, seeking a declaration that its twelve insurers, six of which were defendants in the *Hartford* action, owed a duty to defend and indemnify it. Defendants removed this latter action to federal court. In order to avoid litigating two virtually identical cases in the same court, the parties entered into a stipulation consolidating the two actions.

the Llangollen landfill.[15] The insurance carriers filed answers denying coverage of the claims and asserting affirmative defenses. Several insurers also filed counterclaims and cross-claims.

After extensive discovery in the form of document production and depositions, CNA and seven other insurers (the remaining four had settled with the County) moved for summary judgment, contending that they had no duty to defend and indemnify the County with respect to claims for pollution emanating from the two landfills. The district court issued two opinions denying these motions. On November 2, 1987, the court in *New Castle I* rejected two of the arguments advanced by the insurers as grounds for summary judgment. First, the district court held that the policies' pollution exclusion clause, which bars coverage for damages resulting from discharges of pollutants that are neither sudden nor accidental, did not exclude liability for the claims against the County. 673 F.Supp. at 1362–64. Second, the district court held that the policies' provision restricting coverage to "sums which the insured shall become legally obligated to pay *as damages*" also did not preclude coverage. *Id.* at 1365–66.

On March 31, 1988, the district court in *New Castle II* addressed the remaining grounds for summary judgment. Of particular relevance to this appeal, the district court rejected CNA's assertions that the damage arising from Tybouts Corner did not constitute an "occurrence" under the policies, and that the County had failed to give timely notice to CNA as required by the policies. *See* 685 F.Supp. at 1334.[16] The district court held that there were disputed issues of material fact concerning the "occurrence" issue that required a trial—in particular, whether and when the pollution damage was "expected." *Id.* at 1335.

Prior to trial, all of the defendant insurers except for CNA settled their disputes with the County and were dismissed from the case. On October 23, 1989, following a seven-day bench trial, the district court in *New Castle III* filed findings of fact and conclusions of law. The court held that CNA owed a duty to defend and indemnify the County in the three underlying actions because covered "occurrences" took place during each of CNA's two policy periods.[17] More specifically, the district court found CNA liable under both of the $1 million CGL policies it had issued, as well as under the first of the two $5 million excess policies it also had issued. CNA is thus obligated to indemnify the County for all liability up to $7 million, and, in addition, to defend the County in the three underlying lawsuits.

### F. The Significant Post–Trial Events

The district court's order of October 23, 1989 (the "October 23rd Order"), which accompanied its opinion in *New Castle III*, was styled as a "Final Judgment and Order."[18] When entered, the district court's

---

**15.** Artesian Water Company ("Artesian") filed two lawsuits against the County as a result of the groundwater pollution emanating from the Llangollen landfill. Artesian, a water company that supplies a substantial amount of the drinking water to New Castle County, alleged in a state-court action that leachate from the Llangollen landfill had contaminated the aquifer from which it draws water. *See Artesian Water Co. v. New Castle County*, No. 76–5106 (Del.Ch. filed June 9, 1976). Artesian also filed a federal-court action seeking "response costs" under § 107 of CERCLA. *See Artesian Water Co. v. New Castle County*, No. 83–854 (D.Del. filed Dec. 8, 1983). Because the problem at Llangollen landfill was discovered in September of 1972, prior to the issuance of CNA's policies, the district court granted CNA partial summary judgment for all claims originating from the Llan-

gollen landfill. *See New Castle II*, 685 F.Supp. at 1334.

**16.** CNA subsequently has abandoned the notice issue.

**17.** CNA's two CGL policies were in effect from August 1, 1973, until January 1, 1975, inclusive. The district court held in *New Castle III* that, "[b]ecause the County has shown that new injury continuously occurred through the CNA policy periods, both of CNA's primary policies were triggered." 725 F.Supp. at 813. CNA does not challenge the district court's resolution of the "trigger" issue on appeal.

**18.** On that day, the clerk of the district court, in accordance with Fed.R.Civ.P. 58, entered the judgment against CNA on a separate document in the court's judgment index.

October 23rd Order " 'end[ed] the litigation on the merits,' " *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988) (citation omitted), and hence was final and appealable under 28 U.S.C. § 1291.[19] Therefore, under Fed.R.App.P. 4(a)(1), CNA had until November 22, 1989, (thirty days after the district court entered its October 23rd Order) to file a notice of appeal.[20]

On November 1, 1989, within ten days of the October 23rd Order, CNA served a paper entitled "Motion for Reargument," challenging the order on the grounds that: (1) CNA was not liable for excess coverage because the County had not shown that the underlying policy limits were exhausted; and (2) the County's recovery should have been reduced by the amounts received from other insurers. Although CNA did not specify the procedural basis for its motion for reargument, the district court concluded that it was a motion under District of Delaware Local Rule 3.3.[21] On November 20, 1989, the district court denied CNA's motion for reargument in all respects.

One day later, CNA filed cross-claims pursuant to a stipulation entered into by the parties on February 14, 1986, (the "February 1986 Stipulation") against five co-defendant insurers, all of which previously had settled with the County. CNA represents that, as a consequence of its cross-claims and its motion for reargument, it had two reasons for believing that the original November 22nd deadline for filing an appeal had been postponed. First, because there now were claims remaining to be decided in the case (CNA's newly assert-ed cross-claims), CNA believed that the October 23rd Order no longer was "final" for purposes of 28 U.S.C. § 1291. To obtain appellate review of the district court's October 23rd Order and earlier decisions, CNA thus moved to certify the October 23rd Order as a final judgment under Fed. R.Civ.P. 54(b). Second, CNA thought that, even if the October 23rd Order remained final, its motion for reargument had tolled the time for filing an appeal until December 20, 1989—thirty days after the district court denied its motion for reargument. This is because CNA believed that its motion for reargument was, functionally, a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e).[22] Under Fed.R.App.P. 4(a)(4),[23] a timely Rule 59(e) motion suspends the appeal time, which begins to run anew upon the entry of an order granting or denying the motion. *See Rankin v. Heckler*, 761 F.2d 936, 942 (3d Cir.1985).

At this juncture, recognizing that the district court had styled its October 23rd Order a "final" order, and that, even as tolled by its motion for reargument, an appeal might have to be filed by December 20, 1989, CNA advised the court that, unless its Rule 54(b) motion were decided by December 20th, it would be forced to file a protective appeal. To avoid filing such an appeal, CNA moved for expedited consideration of its Rule 54(b) motion. The district court denied the request for expedited consideration, and CNA therefore filed a protective notice of appeal ("appeal number 89–3814") on December 12, 1989.

**19.** 28 U.S.C. § 1291 states in pertinent part: "The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...."

**20.** Fed.R.App.P. 4(a)(1) states in pertinent part: "In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from...."

**21.** Local Rule 3.3 states in pertinent part: "A motion for reargument shall be served and filed within ten days after the filing of the Court's opinion or decision."

**22.** Fed.R.Civ.P. 59(e) provides: "A motion to alter or amend the judgment shall be served not later than 10 days after the entry of the judgment."

**23.** Fed.R.App.P. 4(a)(4) states in pertinent part: "If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: ... (iii) under Rule 59 to alter or amend the judgment; ... the time for appeal for all the parties shall run from the entry of the order ... granting or denying [the] motion."

On December 29, 1989, the district court denied CNA's Rule 54(b) motion, holding that CNA's cross-claims were untimely under the parties' February 1986 Stipulation, and that Rule 54(b) was, as a result, inapplicable. *See New Castle County v. Continental Casualty Co.*, 728 F.Supp. 324 (D.Del.1989) (*"New Castle IV"*). To challenge what it understood to be the dismissal of its cross-claims, CNA filed a second notice of appeal ("appeal number 90–3012") on January 8, 1990. That same day, the district court, unbeknownst to CNA, entered an order (the "January 8th Order") *formally* dismissing CNA's cross-claims for the reasons set forth in *New Castle IV.* CNA thus filed a third notice of appeal ("appeal number 90–3030") on January 22, 1990.

## III. APPELLATE JURISDICTION

The County contends that none of CNA's three notices of appeal confers jurisdiction upon us to consider the district court's October 23rd Order and earlier decisions.

### A. *Appeal Number 89–3814*

The County maintains that appeal number 89–3814, which was filed on December 12, 1989, was untimely because the district court entered its "final" judgment on October 23, 1989, and the time to file an appeal thus expired thirty days later, on November 22, 1989. This argument is premised on two related contentions. The County insists that: (1) CNA's motion for reargument did not toll the time for appeal because it was made pursuant to Fed.R.Civ.P. 60(b),[24] not Rule 59(e); and (2) the district court's October 23rd Order remained "final" and appealable under § 1291, despite CNA's assertion of cross-claims on November 21, 1989.

**24.** Fed.R.Civ.P. 60(b) provides in pertinent part: "[T]he court may relieve a party . . . from a final judgment . . . [for]: (1) mistake, inadvertence, surprise, or excusable neglect; [or] (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under 59(b). . . . A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation."

### 1. The Rule 59(e) Versus Rule 60(b) Issue

■ "[U]nlike a Rule 59(e) motion, a Rule 60(b) motion does not toll the time for appeal of the judgment." *Sanders v. Clemco Industries*, 862 F.2d 161, 169 (8th Cir.1988); *see also* Fed.R.App.P. 4(a)(4). Since CNA did not formally designate its motion for reargument under the Federal Rules of Civil Procedure, we must attempt to determine the precise character of the motion by means of its content. *See Turner v. Evers*, 726 F.2d 112, 114 (3d Cir.1984). The County argues that, because CNA's motion sought to re-open the trial record and to offer evidence in support of new legal arguments, it was, in substance, a Rule 60(b) motion. We disagree.

■ We believe that CNA's motion for reargument is, for several reasons, best viewed as a Rule 59(e) motion to alter or amend judgment. A motion filed within ten days of the entry of judgment that questions the correctness of the judgment generally is treated as a Rule 59(e) motion. *See* 9 J. Moore, B. Ward, & J. Lucas, *Moore's Federal Practice* ¶ 204.12[1], at 4–72 to 4–74 (2d ed. 1991). Indeed, under our jurisprudence, the first post-judgment bite at the apple ordinarily is construed as a Rule 59(e) motion—assuming it is timely served. *See Turner*, 726 F.2d at 114; *First Jersey National Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 337 (3d Cir. 1983); *Non–Punitive Segregation Inmates v. Kelly*, 589 F.Supp. 1330, 1335 (E.D.Pa. 1984), *aff'd*, 845 F.2d 1014 (3d Cir.1988).[25] The County does not dispute either that CNA's motion for reargument was served within ten days of the October 23rd Order, or that this motion was CNA's first post-judgment bite at the apple.

**25.** We have not, however, gone as far as the Fifth and Seventh Circuits, which treat "any motion to amend a judgment served within ten days after the entry of judgment, except for a . . . motion to correct purely clerical errors, . . . [as] a Rule 59(e) motion." *Willie v. Continental Oil Co.*, 784 F.2d 706, 707 (5th Cir.1986) (*en banc*); *see also Charles v. Daley*, 799 F.2d 343, 347 (7th Cir.1986) (applying the same rule).

■ These persuasive factors are reinforced by the district court's statement that CNA made its motion for reargument under District of Delaware Local Rule 3.3. The language of this Rule essentially tracks that of other local rules providing for motions for "reconsideration." [26] We have held on several occasions that, for purposes of the timeliness of an appeal, a motion styled as a "motion for reconsideration" is the "functional equivalent" of a Rule 59(e) motion. *See Federal Kemper Insurance Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir.1986); *Venen v. Sweet*, 758 F.2d 117, 122 (3d Cir.1985); *Richerson v. Jones*, 572 F.2d 89, 93 (3d Cir.1978). Furthermore, Local Rule 3.3 uses language very similar to that found in Rule 59(e); specifically, both require the motion to be "served" within ten days. Few rules make timeliness dependent on service, as opposed to filing. In sum, we think that timely motions pursuant to District of Delaware Local Rule 3.3, like motions for reconsideration pursuant to other local rules, should be treated as Rule 59(e) motions. We therefore conclude that CNA's motion for reargument was the functional equivalent of a Rule 59(e) motion and tolled the time for filing an appeal until December 20, 1989.[27]

## 2. The Jurisdictional Effect of CNA's Cross–Claims

■ This conclusion does not obviate the need to address the effect of CNA's cross-claims on the "finality" of the October 23rd Order. As a predicate to its claim that appeal number 89–3814 was filed out of time, the County argues that CNA's cross-claims could not strip the October 23rd Order of its "finality," retroactively converting the order into an interlocutory decision in a multiple party case. Because we have held that CNA's motion for reargument had the tolling effect of a Rule 59(e) motion, it now is settled that CNA's time for appeal did not lapse until December 20, 1989—eight days after appeal number 89–3814 was filed. Nonetheless, if, when CNA filed its notice of appeal, the October 23rd Order no longer was a "final" order appealable under § 1291, then appeal number 89–3814 suffers from a different defect —namely, prematurity. To determine whether the October 23rd Order retained its "finality," despite CNA's cross-claims, we must explore the basis for these cross-claims.

CNA's cross-claims, we believe, are based on a good-faith construction of paragraph 3(c) of the parties' February 1986 Stipulation.[28] That paragraph provides that any insurer may file cross-claims against any other insurer within thirty days of when the first insurer is held to owe any duty to the County.[29] CNA contends that it was not found to owe a duty to the County until the district court decided *New Castle III*, and that it filed its cross-claims within the next thirty days.

**26.** *See, e.g.,* E.D.Pa. Local Rule 20(g): "Motions for reconsideration or reargument shall be served within ten (10) days after the entry of the judgment, order, or decree concerned."

**27.** The County makes much of the district court's comment, during a conference call with counsel on December 4, 1989, that the appeal period had expired on November 22, 1989. The County infers from this remark that the district court had characterized CNA's motion for reargument as a Rule 60(b) motion and urges us to defer to that determination. We do not doubt the ability of trial courts to label motions in the first instance. *See Non–Punitive Segregation Inmates,* 589 F.Supp. at 1334 ("In the ordinary situation, a district court will have more experience than the court of appeals with the nature of a litigation and the litigants involved in a case. This will enable the district court more quickly to characterize a motion as one pursuant to Rule 60(b) or Rule 59(e)."). We nonetheless accord little weight to the district court's comment about the tolling effect of CNA's motion, because this particular remark (the exact content of which is impossible to ascertain) was made only in passing during a conference call devoted to another subject (CNA's request for expedited consideration of its Rule 54(b) motion). We do not think that this comment can be read as a formal construction of CNA's motion; instead, we find the court's observation that CNA moved for reargument pursuant to Local Rule 3.3 to be far more instructive.

**28.** In fact, we hold *infra* in Part V.A. that the district court erred in dismissing CNA's cross-claims as untimely under the parties' February 1986 Stipulation.

**29.** *This paragraph is quoted in full infra at 1203.*

Regardless of whether CNA's reading of the February 1986 Stipulation and of the district court's decisions is accurate, it is, at the very least, plausible. Therefore, once CNA asserted its cross-claims, colorable claims remained to be decided in this case. The October 23rd Order was, as a result, no longer this litigation's "final" decision.[30] Rather, the district court's January 8th Order dismissing CNA's cross-claims—irrespective of whether it was correctly decided—was (quite literally) the "final" judgment in this case. We thus conclude that appeal number 89–3814 was premature in that it was taken prior to the district court's January 8th Order.[31]

Under our holding in *Cape May Greene, Inc. v. Warren*, 698 F.2d 179 (3d Cir.1983), however, this defect is not necessarily fatal. The plaintiff in *Cape May Greene* filed its notice of appeal while a cross-claim between two defendants still was pending. This cross-claim was dismissed, however, before we took any action on the merits of plaintiff's appeal. *Id.* at 184. We recognized that, strictly speaking, plaintiff's notice of appeal was premature. None-

theless, we treated plaintiff's appeal as ripening on the date that the cross-claim was dismissed and thus determined that there was appellate jurisdiction. *Id.* at 185.[32] This reasoning applies with equal force to appeal number 89–3814. Although CNA filed this appeal while its cross-claims still were pending, these cross-claims were dismissed before we took any action on the appeal. According to *Cape May Greene*, therefore, appeal number 89–3814 ripened on January 8, 1990, the date on which the district court dismissed CNA's cross-claims.

We believe, however, that appeal number 89–3814 is superfluous because it was superseded by a subsequent and adequate notice of appeal (number 90–3030), *see infra* at 1179, which also challenges the district court's October 23rd Order and earlier decisions. Secure in our understanding that appeal number 89–3814 does, at all events, supply an alternative basis for reaching the merits, we will nonetheless, in the interest of judicial economy, decline to exercise jurisdiction over CNA's first appeal and will dismiss it.[33]

---

**30.** Until the cross-claims were dismissed, Rule 54(b) thus provided the only available avenue for immediate appellate review of the October 23rd Order.

**31.** CNA argues that a "final" order cannot belatedly be stripped of its "finality." The County submits that CNA and itself were the only parties to this case when the October 23rd Order was entered. Because the other insurers long since had settled and been dismissed from the case, the County contends that CNA's putative cross-claims were, in substance, third-party claims requiring service of process. Based on our reading of the February 1986 Stipulation, we think that the insurers that had settled with the County continued to be "parties" to this litigation, notwithstanding that the County's claims against them had been dismissed with prejudice. Indeed, the district court commented to this effect, stating in September of 1987 that the dismissal of an insurer from the case operates only to dismiss claims between the County and the settling insurer and has no effect on the ability of other insurers to file cross-claims in accordance with the February 1986 Stipulation. We therefore conclude that CNA's good-faith assertion of cross-claims did in fact render the October 23rd Order non-final, because that result, however anomalous, clearly was contemplated by the parties and by the district court.

**32.** *Accord FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.,* — U.S. —, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991) (construing Fed.R. App.P. 4(a)(2) to save a premature notice of appeal filed after the district court announced from the bench its intention to grant summary judgment, but before the entry of judgment and before the parties had submitted proposed findings of fact and conclusions of law).

**33.** As noted earlier, CNA's second appeal (number 90–3012) immediately followed the district court's December 29th order denying CNA's motion for Rule 54(b) certification. The opinion accompanying that order was devoted almost entirely to the court's conclusion that CNA's cross-claims were untimely filed. *See New Castle IV,* 728 F.Supp. at 324. CNA filed appeal number 90–3012 to challenge this determination and to preserve its right to appeal the district court's prior orders.

Because the district court's December 29th order formally denied only CNA's Rule 54(b) motion, the court entered a subsequent order, the January 8th Order, dismissing CNA's cross-claims for the reasons set forth in *New Castle IV.* Fearing that the January 8th Order had rendered appeal number 90–3012 defective, CNA filed its third notice of appeal (number 90–3030) on January 22, 1990, using language nearly identical to that found in its second notice of appeal. In view of this overlap and the

B. *Appeal Number 90–3030*

▆▆▆ Appeal number 90–3030, which was filed on January 22, 1990, clearly was taken from a "final" order—i.e., the district court's January 8th Order formally dismissing CNA's cross-claims.[34] The County basically concedes as much, but asserts that the language used by CNA in appeal number 90–3030 was insufficient to encompass the issues raised by its first two appeals. It contends, in particular, that CNA's third appeal was inadequate under Fed.R.App.P. 3(c)[35] and 3d Cir.R. 8(1).[36] These rules both refer appellants to Form 1 of the appendix of forms set forth in the Federal Rules of Appellate Procedure. Form 1 contains blank spaces in which an appellant is supposed to write the date of the order from which he or she is appealing. The County infers from this form that a notice of appeal, in order to pass muster, must set forth the dates of the challenged orders. Because CNA referred to only one order by date (the January 8th Order) in its third notice of appeal, the County argues that this third appeal did not properly raise for review the district court's October 23rd Order and earlier decisions. We disagree.

The County's argument is contrary to the language and spirit of Fed.R.App.P. 3(c) and 3d Cir.R. 8(1). Both rules provide that Form 1 is only a suggested form—not a required one. Moreover, under the law of this circuit, informality of form does not provide grounds for dismissing an appeal.[37] Appeal number 90–3030 challenges "the Order Dismissing CNA's Cross–Claims dated January 8, 1990 and all prior orders, decisions, rulings, opinions, and judgments of the Court in this action." We think that, under the circumstances (CNA filed appeal number 90–3030 on the heels of two prior notices of appeal that listed by date the orders from which CNA now appeals), CNA's intent to appeal the district court's October 23rd Order and earlier decisions fairly can be inferred from the reference to "all prior orders." We therefore hold that appeal number 90–3030 properly raises for our consideration all of the district court's prior decisions in this case. *See Drinkwater*, 904 F.2d at 858.

rule that orders denying Rule 54(b) certification generally are not immediately appealable, *see Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697, 702 (3d Cir.1988); *Makuc v. American Honda Motor Co.*, 692 F.2d 172, 174 (1st Cir.1982), CNA conceded at oral argument that we do not have jurisdiction over this second appeal (number 90–3012). We therefore will dismiss that appeal as well.

34. "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) (citation omitted). In dismissing the only claims then pending, CNA's cross-claims, the district court's January 8th Order clearly satisfies this requirement.

35. Fed.R.App.P. 3(c) provides: "The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof appealed from; and shall name the court to which the appeal is taken. Form 1 in the Appendix of Forms is a suggested form of a notice of appeal. An appeal shall not be dismissed for informality of form or title of the notice of appeal."

36. 3d Cir.R. 8(1) provides in pertinent part: "Attention is called to the requirement of Rule 3(a)

of the Federal Rules of Appellate Procedure that 'an appeal ... from a district court to a court of appeals shall be taken by filing a notice of appeal with the clerk of the district court within the time allowed by Rule 4,' 3(c) regarding the content of the Notice of Appeal, and to Form 1 (Notice of Appeal) attached to those rules in the appendix of forms. A paper filed after the decision of the district court will not be deemed inadequate as a notice of appeal because of informality in its form or title, as long as it evidences an intention to appeal...."

37. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 858 (3d Cir.1990) ("Our jurisprudence liberally construes notices of appeal."); *Williams v. Guzzardi*, 875 F.2d 46, 49 (3d Cir. 1989) ("We have appellate jurisdiction over orders not specified in the notice of appeal if there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues."); *Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252, 1254 (3d Cir.1977) ("It is true that if from the notice of appeal itself and the subsequent proceedings on appeal it appears that the appeal was intended to have been taken from an unspecified judgment order or part thereof, the notice may be construed as bringing up the unspecified order for review.").

■ One final jurisdictional point remains to be considered. As we will discuss at length below, *see infra* at 1203–1205, we believe that CNA's cross-claims were timely filed under the parties' February 1986 Stipulation. We therefore will reverse the district court's January 8th Order dismissing those cross-claims without prejudice. Once CNA's cross-claims are reinstated, this case again becomes an action involving multiple parties with other claims remaining to be decided. A question thus arises whether we should remand this case to the district court for possible Rule 54(b) certification before reaching the merits of CNA's appeals. In our view, such a time consuming step is unnecessary here.

We think that our determination that CNA's cross-claims were improperly dismissed by the district court neither deprives the January 8th Order of its "finality" nor impairs our jurisdiction to reach the merits of CNA's appeals. The district court's January 8th Order, as we explained *supra* at 1179 was final under § 1291 because it ended the litigation. We know of no case that says that an order that is "final" when an appeal is taken can be rendered non-final by a later decision of the appellate court.[38] Furthermore, given our decision that a timely appeal was taken from a "final" order, we think that 28 U.S.C. § 2106 affords us broad discretion to consider the district court's orders in their entirety.[39] We can conceive of no compelling reason to defer consideration of CNA's appeals. The merits have been fully briefed and argued, and our decision may offer valuable guidance to other courts currently grappling with these issues.

Based on the foregoing, we hold that there is appellate jurisdiction in this case by way of appeal number 90–3030. We turn now to the merits of CNA's appeals.

## IV. THE INSURANCE COVERAGE ISSUES

### A. *Preliminary Matters*

#### 1. CNA's Contracts of Insurance

CNA provided primary general liability coverage to the County under two $1 million policies, the first running from August 1, 1973, through July 1, 1974, and the second running from July 1, 1974, through January 1, 1975.[40] Like most of the other insurers in this case, CNA employed a standardized, pre-printed CGL policy, providing the following coverage:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
>
> B. property damage
>
> to which the insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent. . . .

Although CNA's policies did not define the term "occurrence," the County and CNA agree that an "occurrence" is

> an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property

---

**38.** We are mindful that appellate courts sometimes decline to address a collateral issue in the first instance when the district court's decision on remand might eliminate the need to decide the issue altogether. *See, e.g., Baskin v. Hawley*, 810 F.2d 370, 371–72 (2d Cir.1987). That situation, however, does not exist here. The district court's disposition of CNA's cross-claims will not obviate the need for us to consider the underlying merits of CNA's appeals.

**39.** 28 U.S.C. § 2106 provides that: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order

of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

**40.** The County's other two CNA policies provided $5 million in excess "umbrella" coverage (for liabilities in excess of the primary coverage). The first excess policy ran from May 11, 1973, through July 1, 1974, and the second ran from July 1, 1974, through July, 1, 1975. Neither of these excess policies pertains in any significant respect to the instant appeals.

damage, neither expected nor intended from the standpoint of the insured.

CNA's policies also contain a standardized exclusionary clause, known in the industry as the "pollution exclusion." This clause bars insurance coverage for

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

This standardized CGL policy was drafted by committees of insurance representatives sponsored by the Insurance Service Office ("ISO") and its predecessor organizations, the Insurance Rating Board ("IRB") and the National Bureau of Casualty Underwriters ("NBCU"). The ISO is a trade association that provides rating, statistical, actuarial and policy drafting services to about 3,000 insurers, including CNA. Policy forms developed by the ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. In many states, including Delaware, standardized ISO insurance forms cannot be marketed to consumers until they obtain regulatory approval.

### 2. The Burden of Proof in Insurance Cases

It is hornbook law that the *insured* must demonstrate that the claimed loss is comprehended by the policy's general coverage provisions. *See* 19 G. Couch, *Couch on Insurance 2d* § 79:315, at 255 (M. Rhodes rev. ed. 1983); *see also Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir.1978) (stating Penn-

sylvania law). If the insured shoulders this burden, then the *insurer* must come forth with proof that a policy exclusion applies. *See* 19 G. Couch, *supra*, § 79:315, at 256. We have no doubt that Delaware law is in accord on these basic propositions.

The County therefore must establish that the loss resulting from its operation of the Tybouts Corner landfill falls within the CGL policies' basic grant of coverage. More to the point, the County must show that its liability in the three underlying actions constitutes a loss which it is legally obligated to pay "as damages" because of property damage caused by an "occurrence." CNA, on the other hand, bears the burden of proving facts that bring this case within the ambit of the pollution exclusion: it must demonstrate that the County's liability in the three underlying actions results from property damage arising out of the emission of pollutants. Neither party disputes the division of the burden of proof thus far.

The County and CNA, however, do contest which party has the burden of proof concerning the "sudden and accidental" exception to the pollution exclusion clause. The County submits that the insurer bears the burden of proving that the exception does not apply. In some cases, however, *see, e.g., A. Johnson & Co. v. Aetna Casualty & Surety Co.*, 741 F.Supp. 298, 305 (D.Mass.1990), *Fireman's Fund Insurance Cos. v. Ex-Cell-O Corp.*, 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988), and *Fischer & Porter Co. v. Liberty Mutual Insurance Co.*, 656 F.Supp. 132, 140 (E.D. Pa.1986), the insured has been assigned the additional burden of proving that the "sudden and accidental" exception applies.[41] CNA thus contends that, once it has established the applicability of the pollution exclusion clause, the burden shifts back to the County to demonstrate that the "sud-

---

**41.** *Accord* 19 G. Couch, *supra*, § 79:385, at 338:
> In many instances, a policy exception is itself subject to exceptions or limitations. When this is the case, the insurer in proving that the loss comes within the exception must also proceed further to show that the exception or limitation to the exception does not preclude the application of the exception....

> There is, however, authority that when a policy contains an exception within an exception, the insurer need not negative the internal exception; rather, the plaintiff must show that the exception from the exemption from liability applies.

den and accidental" exception to the clause saves its claim.

No Delaware law on this question has been provided by the parties. We nonetheless predict that, if the Delaware Supreme Court were confronted with this issue, it would allocate the respective burdens of proof in accordance with the traditional distinction between coverage clauses and exclusionary clauses. *Cf. United States Fidelity & Guaranty Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 443 (D.Kan.1990) (adhering to the basic distinction between coverage and exclusionary clauses).[42] Because the "sudden and accidental" exception is part of an exclusionary clause (the pollution exclusion) we believe that Delaware would impose on the insurer (CNA) the burden of proving not only that the property damage at issue resulted from the discharge of pollutants, but also that the discharge was neither sudden nor accidental.

### 3. The Interpretation of Insurance Policies Under Delaware Law

As the district court explained, the "interpretation of an insurance contract under Delaware law involves special rules of construction." *New Castle I*, 673 F.Supp. at 1364. We think it useful, at the outset, to review these "special rules" in order to elucidate the legal terrain in which we presently find ourselves situated.

 The centerpiece of the County's case is the doctrine of *contra proferentem*. This doctrine is "[u]sed in connection with

the construction of written documents to the effect that an ambiguous provision is construed most strongly against the person who selected the language." Black's Law Dictionary 296 (5th ed. 1979). Under Delaware law, "[i]f there is any ambiguity in [an insurance] policy, that ambiguity must be resolved in favor of the insured and against the insurer that drafted the policy." *Aetna Casualty & Surety Co. v. Kenner*, 570 A.2d 1172, 1174 (Del.1990); *see also Hallowell v. State Farm Mutual Automobile Insurance Co.*, 443 A.2d 925, 926 (Del.1982); *Steigler v. Insurance Co. of North America*, 384 A.2d 398, 400 (Del. 1978).[43] Policy language is considered ambiguous only if it "permits two or more *reasonable* interpretations." *Hallowell*, 443 A.2d at 926 (emphasis added). As the Supreme Court of Delaware has succinctly stated:

> Ambiguity does not exist merely because two conflicting interpretations may be suggested. Rather, both interpretations must reflect a reasonable reading of the contractual language.

*Kenner*, 570 A.2d at 1174. In other words, to establish an ambiguity, the insured must do more than proffer a competing *"possible* construction of the policy." *Id.* (emphasis in original). Unless the insured's interpretation reflects an objectively reasonable reading of the disputed passage, the doctrine of *contra proferentem* is inapplicable.

 To bolster its interpretation of the policies, CNA advances several countervailing rules of Delaware insurance law,

---

**42.** *See also Shell Oil Co. v. Accident & Casualty Insurance Co. of Winterthur,* No. 278953, slip op. at 27 (Cal.Super. Oct. 6, 1988) (holding that "the insurer has the burden of establishing that an exception to an exclusion does not preclude application of the exclusion"); *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.,* No. 83–3347, slip op. at 170 (D.D.C. Sept. 7, 1988) (also holding that the insurer must establish that "the exception to the exclusion does not apply").

**43.** This rule derives from the fact that an insurance contract "is an adhesion contract, not a truly consensual agreement." *State Farm Mutual Automobile Insurance Co. v. Johnson,* 320 A.2d 345, 347 (Del.1974); *see also Graham v. State Farm Mutual Automobile Insurance Co.,*

565 A.2d 908, 912 (Del.1989). Because "'the terms of an insurance policy are not talked out or bargained for as in the case of contracts generally,'" Delaware courts recognize that "'an insurance contract should be read to accord with the reasonable expectations of the purchaser so far as its language will permit.'" *Johnson,* 320 A.2d at 347 (citation omitted).

We note also that, in cases involving standard insurance policy language drafted by the insurance industry, the court, after finding the policy language to be ambiguous, need not inquire into the parties' actual intent. Rather, we think that, under Delaware law, standard-form insurance contracts (which are not mutually negotiated) are construed against the insurer as a matter of law. *Cf. Kenner,* 570 A.2d at 1174.

seeking to convince us that those rules, not the doctrine of *contra proferentem*, govern this case. First, CNA points out that "a Delaware court will not destroy or twist the words [of insurance contracts] under the guise of construing them." *Hallowell*, 443 A.2d at 926. If "the language of an insurance contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." *Id.*[44] Second, CNA notes that the Delaware Supreme Court has stated that "a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985).[45] "[A] single clause or paragraph of a[n] [insurance] contract cannot be read in isolation, but must be read in context, and every portion of the contract deserves consideration." *Cheseroni v. Nationwide Mutual Insurance Co.*, 402 A.2d 1215, 1217 (Del.Super. 1979), *aff'd*, 410 A.2d 1015 (Del.1980). We discuss the application of these principles *infra*.

### 4. The Issues on Appeal

CNA essentially raises three challenges to the district court's decision that it has a duty to defend and indemnify the County for all claims relating to the pollution problem at the Tybouts Corner landfill. First, CNA asserts that the district court erred as a matter of law in holding that the three underlying lawsuits against the County for "response costs" and other equitable relief seek "damages" within the meaning of CNA's insurance policies. Second, CNA contends that the district court's factual determination that the pollution damage from Tybouts Corner landfill constituted an "occurrence" (i.e., an accident neither expected nor intended from the standpoint of the insured) was clearly erroneous. And finally, CNA argues that the district court committed legal error in holding that the pollution exclusion clause did not bar coverage in this case.

### 5. Our Scope of Review

■ Our standard of review of the district court's interpretation of CNA's policies and of its application of controlling legal principles is plenary. *See STV Engineers, Inc. v. Greiner Engineering, Inc.*, 861 F.2d 784, 787 (3d Cir.1988). As we observed in *Pacific Indemnity Co. v. Linn*, 766 F.2d 754 (3d Cir.1985):

> Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law. Therefore, our review is plenary. Similarly, whether an insurance policy is ambiguous is a legal question over which our review is plenary.

*Id.* at 760 (citations omitted). We therefore will review *de novo* the district court's holdings: (1) that the pollution exclusion clause does not bar the County's coverage claims; and (2) that the underlying actions against the County seek "damages" within the meaning of CNA's policies.

However, "in reviewing factual findings made by a district court, we apply the clearly erroneous standard set out in Fed. R.Civ.P. 52(a)." *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 128 (3d Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *see also Ram Construction Co. v. American States Insurance Co.*, 749 F.2d 1049, 1053 (3d Cir.1984). This deferential standard of review thus limits our analysis of whether the district court erred in finding that the pollution damage from Tybouts Corner was "unexpected" within the meaning of the "occurrence" clause. Although this standard requires us to defer

---

**44.** *See also Lamberton v. Travelers Indemnity Co.*, 325 A.2d 104, 106 (Del.Super.1974) ("[W]here the language of an insurance policy is clear, even though contained in an exclusionary provision, then both the insurer and the insured are bound by it's [sic] terms as in any arms length transaction."), *aff'd*, 346 A.2d 167 (Del. 1975).

**45.** Although *E.I. du Pont de Nemours & Co. v. Shell Oil Co.* involves the interpretation of a licensing agreement between two manufacturers, we think that the Delaware Supreme Court's general statement therein regarding courts' obligation to construe agreements as a whole also applies to the construction of insurance policies.

to the district judge's findings of fact, we are obliged to correct those findings if we are left "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

### B. *The "As Damages" Clause*
#### 1. Background

As we noted above, the insurance policies at issue obligate CNA to pay "all sums which the insured shall become legally obligated to pay *as damages* because of bodily injury or property damage." (Emphasis added). In order to appreciate CNA's contentions regarding the above highlighted phrase, it is necessary to delineate the background of CERCLA and to describe the nature of the three underlying actions against the County.

Enacted in 1980, CERCLA established a "Superfund" to finance the cleanup of hazardous waste sites. *See Morrison Grain,* 734 F.Supp. at 441. After a site has been identified as requiring remedial action, the EPA has two statutory options under CERCLA. *See* Note, *Developments in the Law—Toxic Waste Litigation,* 99 Harv.L. Rev. 1459, 1484–86 (1986). First, if the responsible party refuses or is unable to take proper action, section 104 allows the EPA, financed by the Superfund, to pursue direct "response action" by cleaning up the site itself. 42 U.S.C. § 9604. The EPA thereafter can institute a recovery action under section 107 to require the responsible party to replenish the Fund. 42 U.S.C. § 9607. Second, the EPA can seek an injunction under section 106 to compel the potentially responsible party to clean up the site itself. 42 U.S.C. § 9606.[46]

In the first underlying lawsuit against the County, *United States v. New Castle County,* No. 80–489 (D.Del. filed Oct. 4, 1980), the EPA pursued both its first and second statutory options. Pursuant to CERCLA § 106, the EPA sought an injunction requiring the County and other defen-

dants "to abate an endangerment to the health and welfare of persons and to the environment presented by the disposal of wastes at the Tybouts Corner Landfill." App. at 2122. In addition, the EPA also sought to recover under CERCLA §§ 104 and 107 the monies that it had expended "for investigative activities and other response and remedial actions related to contamination at and from the Landfill." App. at 2123.

The second and third underlying lawsuits against the County, although resembling the EPA's action in the relief sought, differ in that they were initiated by private litigants. In *Wagner v. New Castle County,* No. 82–7008 (Del.Ch. filed Nov. 10, 1982), Sarah Wagner, an individual residing proximate to Tybouts Corner, sued the County and others, claiming that her drinking well was contaminated by leachate from the landfill. Based in part on CERCLA § 106, Wagner's complaint seeks preliminary and permanent injunctive relief requiring:

A. Defendants to cease and desist from their continuing trespass and from further invasion of plaintiff's land.

B. To take such steps as are necessary to free plaintiff's land from the contamination caused by defendants.

C. To respond in damages to plaintiff for the loss of use and value of her property.

App. at 2120.

Similarly, in *Andrews v. New Castle County,* No. 84–7008 (D.Del. filed Mar. 2, 1984), thirty-nine residents living near Tybouts Corner commenced a class action against the County and other defendants. Count One of the *Andrews* complaint, seeking recovery of response costs, is bottomed on CERCLA § 107. App. at 2142. The *Andrews* complaint also requests a permanent injunction prohibiting:

(i) defendants' continued discharge of pollutants into the ground water and surface streams in violation of [the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ].

---

**46.** The EPA also has a third option not expressly mentioned in CERCLA: it can obtain through negotiations a voluntary agreement from a re-

sponsible party to clean up the site. Note, *Toxic Waste Litigation, supra,* at 1486 n. 9.

(ii) defendants' continuing trespass; and (iii) defendants' creation and maintenance of a nuisance.

App. at 2170.

In its motion for summary judgment, CNA asserted that the foregoing actions for "response costs" and other equitable relief do not seek "damages" within the meaning of its insurance policies. The district court in *New Castle I* rejected that argument. Reiterating that language in an insurance policy should be given its normal, everyday meaning, the district court found CNA's technical interpretation of the word "damages" to be inappropriate under Delaware law:

> A dictionary definition of "damages" states that the word means: "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." Webster's Third New International Dictionary, at 571 (1971). Thus, an ordinary definition of the word "damages" makes no distinction between actions at law and actions in equity. The underlying lawsuits at issue would therefore be covered, as they involve costs that the County may become "legally obligated to pay" as a result of injuries sustained by the respective Plaintiffs or compensation imposed by law for a wrong.

673 F.Supp. at 1365–66.

### 2. CNA's Contentions on Appeal

On appeal, CNA renews its claim that the word "damages" in the insurance context unambiguously refers only to *legal* damages and therefore does not encompass liability resulting from actions that are equitable in nature, such as those brought under CERCLA seeking injunctive relief and response costs. Relying on the same dictionary cited by the district court in *New Castle I*,[47] CNA contends that the court

erred in concluding that the "ordinary definition" of the word "damages" does not distinguish between legal and equitable actions. CNA then cites a state court opinion interpreting the same dictionary definition quoted by the district court, but reaching the opposite conclusion. *See Atlantic Wood Industries, Inc. v. Argonaut Insurance Co.*, No. X87–1019–4, slip op. at 9 (Ga.Super.Ct. May 30, 1989) ("'The dictionary definitions of the word 'damages' illustrates the technical nature of the word itself; 'damages' is a term of art peculiar to the legal profession and as such to be accorded its peculiar meaning. . . .'").

CNA also argues that the district court's expansive interpretation of "damages" completely nullifies the phrase "as damages." More specifically, CNA insists that it agreed to indemnify the County not for *all* sums that the County shall become obligated to pay, but only for those sums that the County shall become obligated to pay *as damages*. Because Delaware law requires us, if possible, to give effect to every term in an insurance policy, *see Cheseroni*, 402 A.2d at 1217, CNA submits that the word "damages" must be construed to preclude coverage for equitable claims, such as those for response costs and injunctive relief.

CNA's arguments regarding the meaning of the term "damages" are not without force. Indeed, they have been accepted by two United States Courts of Appeals and at least one state supreme court. *See Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co.*, 842 F.2d 977 (8th Cir.) (*en banc*), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ("*NEPACCO*"); *Patrons Oxford Mutual Insurance Co. v. Marois*, 573 A.2d 16 (Me.1990).[48]

---

**47.** See 673 F.Supp. at 1365 (definition of "damages" includes "'compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right'" (quoting Webster's Third New International Dictionary 571 (1971))).

**48.** *See also Troy Mills, Inc. v. Aetna Casualty & Surety Co.*, No. 89–311 (N.H. Feb. 13, 1990) (summarily affirming superior court decision holding that cleanup costs are not damages within the meaning of liability insurance policies).

The *Armco* case, like this one, involved a declaratory judgment action brought by an insurer to determine whether a standard CGL policy obligated it to indemnify its insured for liability arising out of a suit under CERCLA for response costs and injunctive relief. The Fourth Circuit, applying Maryland law, stated that " '[d]amages,' as distinguished from claims for injunctive or restitutionary relief, includes 'only payments to third persons when those persons have a *legal* claim for damages.' " *Id.* at 1352 (quoting *Aetna Casualty & Surety Co. v. Hanna*, 224 F.2d 499, 503 (5th Cir. 1955) (emphasis added)). The court opted for this "somewhat narrow, technical definition of damages," 822 F.2d at 1352, in part because it concluded that the broad construction urged by the insured would rob the term of all independent effect:

> If the term "damages" is given the broad, boundless connotations sought by the [insured], then the term "damages" in the contract ... would become mere surplusage, because any obligation to pay would be covered. The limitation implied by employment of the phrase "to pay as damages" would be obliterated.

*Id.* Since the suit against the insured sought a form of equitable relief, "not 'damages' in the legal sense," *id.*, the *Armco* court held that the insured was not covered by the standard CGL policy.[49]

Sitting *en banc* in *NEPACCO*, the Eighth Circuit, applying Missouri law, arrived at a similar interpretation of the word "damages." Although conceding that "damages" is an ambiguous term from the viewpoint of the lay person, the *NEPACCO* court insisted that "[i]n the insurance context, ... the term 'damages' is not ambiguous, and the plain meaning of the term 'damages' as used in the insurance context refers to legal damages and does not include equitable monetary relief." 842 F.2d at 985. Such a limited construction of the term "damages," the court stated, was consistent with its obligation under Missouri law to construe the policy as a whole:

> [The insurer] did not agree to pay "*all sums*" which the insured shall become legally obligated to pay." [The insurer] agreed to pay "all sums which the insured shall become legally obligated to pay *as damages.*" The expansive reading of the term "damages" urged by the state would render the term "all sums" virtually meaningless.

*Id.* at 986 (emphasis in original).[50]

Finally, the Supreme Judicial Court of Maine in *Patrons* also accorded "damages" its technical, legal interpretation, even though it realized that lay persons may not recognize the word as a term of art:

> There are many words, phrases or paragraphs in a standard insurance contract that a first time reader does not understand. That circumstance does not justify excising such provisions from the contract. Only when they are ambiguous is their interpretation affected, and the insured given the benefit of the doubt. Previous judicial interpretations made clear the meaning of the words "pay as damages" when used in an insurance contract.

**49.** See also *Cincinnati Insurance Co. v. Milliken & Co.*, 857 F.2d 979, 980–81 (4th Cir.1988) (applying South Carolina law and arriving at same conclusion).

**50.** The *NEPACCO* court also observed: " 'Traditionally, courts have found no insurance coverage for the costs of complying with an injunction even in cases where the suits could have been brought for damages.' " *Id.* (quoting *Maryland Casualty Co. v. Armco, Inc.*, 643 F.Supp. 430, 434 (D.Md.1986)). The court further noted that CERCLA § 107(a)(4) expressly distinguishes between response costs and damages. *Compare* 42 U.S.C. § 9607(a)(4)(A),(B) (recovery of cleanup costs by governments and by "any other person"), *with* 42 U.S.C.

§ 9607(a)(4)(C) (recovery of damages for injury, destruction or loss of natural resources in which the government has a proprietary interest). This distinction, the court emphasized, is not "merely fortuitous":

> The cost of cleaning up a hazardous waste site often exceeds its original value. On the other hand, some natural resources are of exceptional value and their destruction could greatly exceed the cost of cleaning up any hazardous waste contamination. A significant difference between the measurement of liability for cleanup costs and for damage to natural resources could determine whether the government sues for cleanup costs or for damages.

842 F.2d at 986–87.

573 A.2d at 19 (footnote and citations omitted). Like the courts in *Armco* and *NEP-ACCO*, the *Patrons* Court believed that a contrary interpretation of "damages" effectively would read the phrase "as damages" out of the policy. *Id.* at 19 n. 7. It thus held that the contractual language "providing coverage for amounts the insured is 'legally obligated to pay as damages' does not cover expenses the insured incurs in meeting [government] clean-up demands." *Id.* at 16.

### 3. The County's Response

The County bases its response on two interlocking and undisputed precepts of Delaware insurance law—namely, that (1) "[c]lear and unambiguous words and phrases in insurance policies should be given their ordinary, usual meaning," *Johnston v. Tally Ho, Inc.*, 303 A.2d 677, 679 (Del. Super.1973); and (2) insofar as "there is any ambiguity in the policy, that ambiguity must be resolved in favor of the insured and against the insurer that drafted the policy," *Kenner*, 570 A.2d at 1174. Simply stated, the County contends that the popular dictionary definition of the word "damages" does not distinguish between monetary liabilities imposed by courts of law and those imposed by courts of equity. To the extent that any ambiguities exist in this popular definition of "damages," the County insists that they do not defeat coverage, for all ambiguities are construed "strongly against the insurer," *Hallowell*, 443 A.2d at 926. Ascribing to the term its "ordinary, usual meaning" and construing all semantic uncertainties in favor coverage, the County contends that the term "damages" encompasses any cleanup costs imposed by the government and expended under the sanction of law. The County's position, like that of its adversary, is not lacking in precedential support, having been adopted by the Second Circuit and two state supreme courts.

Applying New York law, the Second Circuit in *Avondale Industries, Inc. v. Travel-*ers Indemnity Co., 887 F.2d 1200 (2d Cir. 1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990), held that a proceeding commenced by a state agency to recover cleanup costs exposes the insured to "damages" within the meaning of the standard CGL policy. Under New York law, the terms of an insurance policy are "accorded 'a natural and reasonable meaning,' corresponding to 'the reasonable expectation and purpose of the ordinary businessman.' " *Id.* at 1206–07 (citations omitted). Noting that the word "damages" is not defined in the insurance policy, the *Avondale* court declined to give the term the narrow meaning (i.e., remedies at law) suggested by the insurer:

> [V]iewed from the insured's perspective, we think an ordinary businessman reading this policy would have believed himself covered for the demands and potential damage claims now being asserted in the [state] administrative proceeding, particularly absent any specific exclusionary language in the policy.

*Id.* at 1207 (citation omitted).

The Supreme Court of Washington, in an even more detailed opinion applying that state's law, similarly held that response costs constitute "damages" under the standard CGL policy. *See Boeing Co. v. Aetna Casualty & Surety Co.*, 113 Wash. 2d 869, 784 P.2d 507 (1990). The Court thought it odd that insurers would bury a major exclusion in the policy's basic coverage provision, especially because this purported exclusion is not specifically denominated as such, and the meaning of "damages" is not explained in the policy's definitional section. *Id.* at 877, 784 P.2d at 511. The Court also observed that the word, by its plain, ordinary meaning as defined in both standard and insurance dictionaries, does not distinguish between legal and equitable actions. *Id.*[51] Finally, the *Boeing* Court surveyed the vast array of authority on

---

**51.** Referring to two commonly used insurance dictionaries that define "damages" consistent with the popular, lay interpretation of the word, the Court stated: "Even a policyholder with an insurance dictionary at hand would not learn about the coverage-restricting connotation to 'damages' that the insurers argue is obvious." *Id.* at 878, 784 P.2d at 511.

point,[52] agreeing with those courts that have adopted a common-sense interpretation of "damages" and disputing the reasoning of those courts that have restricted the term to its legal and technical meanings:

> In [Washington], legal technical meanings have never trumped the common perception of the common man. "[T]he proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract" but instead "whether the insurance policy contract would be meaningful to the layman...."

*Id.* at 881, 784 P.2d at 513 (citation omitted).

Confronted with the same issue, the Supreme Court of North Carolina arrived at the same conclusion as the Second Circuit and the Supreme Court of Washington. *See C.D. Spangler Construction Co. v. Industrial Crankshaft & Engineering Co.*, 326 N.C. 133, 388 S.E.2d 557 (1990). After recounting the relevant case law, the *Spangler* Court cogently encapsulated its holding in the following paragraph:

> We rest our decision ... on the basis that the term "damages" is not being used in its legal and technical sense in these policies. As [the] cases show, it is a term easily susceptible to more than one definition. Clearly, there is a specific, technical definition for the word: "payments to third persons when those persons have a legal claim for damages." If the insurer intended that "damages" have only this meaning, it should have so indicated in the policy. The insured would then have understood that cleanup costs incurred pursuant to government mandate were not covered, and would have been able to enter into other insur-

ing agreements. Because such a limiting definition was not included in the policy, we must conclude that the parties did not intend "damages" to have a specific technical meaning in the insurance policy. Rather, they intended to use its ordinary meaning. Use of the plain, ordinary meaning of a term is the preferred construction.

*Id.* at 151, 388 S.E.2d at 568 (citation omitted).

#### 4. Legal, Technical Meaning or Plain, Ordinary Meaning?

The competing lines of cases relied upon by CNA and the County demonstrate that resolution of this issue turns on whether the word "damages" should be given its legal, technical meaning or its plain, ordinary meaning. Given the precepts of Delaware law and the absence of a definition limiting the meaning of "damages" in CNA's policies, we think that to state the question is virtually to answer it. In our view, the ordinary, usual meaning of "damages," which we are bound to apply under Delaware law unless the policy clearly directs us to another meaning, does not convey the limitations suggested by CNA. In short, we believe that the Delaware Supreme Court would find the *Avondale-Boeing-Spangler* line of cases to be the better reasoned. We thus conclude that the term "damages," in the context of a standard CGL policy, should be interpreted broadly to encompass response costs and other equitable relief.

Based on our reading of the case law set forth in Part III.A.3. of this opinion, we think that Delaware insurance law is not substantially different from that of other jurisdictions and can be summarized as follows. Generally, terms in an

---

**52.** We thus far have adverted to only a small sample of those cases. For other cases holding that environmental cleanup costs are "damages" within the meaning of CGL policies, *see Intel Corp. v. Hartford Accident & Indemnity Co.*, 692 F.Supp. 1171 (N.D.Cal.1988); *Aerojet–General Corp. v. San Mateo County Superior Court*, 211 Cal.App.3d 216, 257 Cal.Rptr. 621, 258 Cal.Rptr. 684 (1989); *Fireman's Fund Insurance Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71 (E.D.Mich. 1987); *CPS Chemical Co. v. Continental Insur-*

*ance Co*, 222 N.J.Super. 175, 536 A.2d 311 (1988). For other cases holding that environmental cleanup costs do not constitute "damages," *see Hayes v. Maryland Casualty Co.*, 688 F.Supp. 1513 (N.D.Fla.1988); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F.Supp. 950 (N.D. Ill.1988); *Travelers Indemnity Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252 (D.Md.1989); *Travelers Insurance Co. v. Ross Electric of Washington, Inc.*, 685 F.Supp. 742 (W.D.Wash.1988).

insurance policy are accorded their ordinary, usual meaning. If, however, a single plain meaning cannot be determined for a term (that is, if the term admits of two or more *reasonable* interpretations), the ambiguity must be resolved against the insurer and consistent with the insured's reasonable expectation of coverage. The risk of ambiguity is imposed on the insurer as the drafter of the policy, which is essentially a contract of adhesion. An insurer has several options, of course, to minimize the risk that ambiguous terms will be construed against it. These include: (1) selecting a very precise term that is susceptible of only one reasonable interpretation; (2) carefully placing the potentially ambiguous term in a context that clearly conveys its intended meaning; or (3) expressly defining the term somewhere in the policy. But if the insurer elects to forgo these prophylactic measures (or some combination thereof) and intentionally or inadvertently chooses vague language, it must be prepared to assume the risk that the courts will afford coverage in some situations in which the insurer did not intend to provide it.

Like the district court, we think that Webster's definition of "damages"—i.e., "the estimated reparation in money for detriment or injury sustained"—best captures the word's plain meaning. *See* Webster's Third New International Dictionary 571 (1971). Applying this definition to the case at bar, we believe that CNA's potential monetary liability for the costs of repairing the damage to neighboring property resulting from the migration of pollutants from the Tybouts Corner landfill constitutes "damages." We acknowledge that the alternative, legal interpretation of the term "damages" proffered by CNA is a reasonable (albeit technical) construction of the term. But the existence of a second reasonable interpretation simply creates an ambiguity, in which case CNA still loses because all ambiguities are construed strongly against the insurer.

Apparently conceding that the average lay person would interpret the word "damages" more broadly than it does, CNA argues that "[t]he County, with its own insurance brokers and legal advisors," is a sophisticated purchaser of insurance and, as such, is not entitled to the benefit of the term's popular, lay meaning. CNA's Br. at 38 n. 28.[53] We disagree. Nothing in Delaware insurance law suggests that a different rule of construction applies whenever the insured is a sophisticated purchaser of insurance. To the contrary, we believe that Delaware would follow New Jersey, which already has held that:

> These principles [of interpretation] are no less applicable merely because the insured is itself a corporate giant. The critical fact remains that the ambiguity was caused by language selected by the insurer.

*CPS Chemical Co. v. Continental Insurance Co.*, 222 N.J.Super. 175, 189–90, 536 A.2d 311, 318 (1988). More significantly, we can conceive of no compelling reason why even a sophisticated insured should not be entitled to a pro-coverage interpretation of a standardized ISO policy drafted by the insurance industry. As the *Boeing* Court explained:

> The specific language in question was not negotiated, therefore, it is irrelevant that some [insureds] have [in-house] counsel. Additionally, this standard form policy has been issued to [sophisticated] and [unsophisticated insureds] throughout the state. Therefore it would be incongruous for the court to apply different rules of construction based on the policyholder because once the court construes the standard form

---

**53.** For a similar analysis, *see Eagle Leasing Corp. v. Hartford Fire Insurance Co.*, 540 F.2d 1257, 1261 (5th Cir.1976) ("We do not feel compelled to apply, or, indeed, justified in applying the general rule that an insurance policy is construed against the insurer in the commercial insurance field when the insured is not an innocent but a corporation of immense size, carrying insurance with annual premiums in six figures, managed by sophisticated business men, and represented by counsel on the same professional level as the counsel for insurers." (footnote omitted)), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977).

coverage clause as a matter of law, the court's construction will bind policyholders throughout the state regardless of [their sophistication].

113 Wash.2d at 883, 784 P.2d at 514. We are therefore satisfied that, under Delaware law, the parties to an insurance contract are bound by the popular, lay meaning of its terms, regardless of the sophistication of the insured.

Nor are we dissuaded by the decisions of the Fourth and Eighth Circuits in *Armco* and *NEPACCO* respectively.[54] To the contrary, we find much in those decisions that reinforces, rather than undermines, our holding here.[55] The *NEPACCO* court overtly conceded that "from the viewpoint of the lay insured, the term 'damages' could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses." 842 F.2d at 985. Similarly, the *Armco* court acknowledged that the ordinary meaning of "damages" is broader than the definition espoused by the insurer. Yet both of these courts opted instead for a legal, technical construction of the word "damages." Although such an approach may be consistent with the law of Missouri and Maryland, we find nothing in Delaware law that counsels us to disregard a term's plain meaning in favor of a narrower, technical definition, absent specific instructions in the policy itself.[56]

In sum, we believe that Delaware would find the sentiments expressed by the Supreme Court of North Carolina in *Spangler* equally apt here.

"When an insurance company, in drafting its policy of insurance, uses a 'slippery' word to mark out and designate those who are insured by the policy, it is not the function of the court to sprinkle sand upon the ice by strict construction of the term. All who may, by any reasonable construction of the word, be included within the coverage afforded by the policy should be given its protection. If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into coverage somewhat more extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound."

326 N.C. at 152–53, 388 S.E.2d at 569 (quoting *Jamestown Mutual Insurance Co. v. Nationwide Mutual Insurance Co.*, 266 N.C. 430, 437–38, 146 S.E.2d 410, 416 (1966)). Having selected the term "damages," a "slippery" word that the average business person might not recognize as a term of art, and having elected not to resolve the term's ambiguity by specifically defining it, CNA exposed itself to liability for claims such as the County's. We hold that, under Delaware law, CNA is bound by the ordinary, lay meaning of the word "damages," which in our view does not distinguish between legal and equitable lia-

---

**54.** *See Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 565 (D.Del.1989) (rejecting the reasoning of *Armco* and *NEPACCO*).

**55.** As the *Boeing* Court observed:
> Even [*NEPACCO*] and *Armco*, which found that "damages" do not include cleanup costs, support the policyholders' position. The reason is that these cases admit that the common meaning of the word "damages" is broad and all inclusive.

113 Wash.2d at 881, 784 P.2d at 513.

**56.** In adopting the limited definition of "damages" urged by insurers, both the *NEPACCO* and *Armco* courts feared that a contrary construction of the term would render the phrase "as damages" mere surplusage. This point requires reflection, for under Delaware law, we are bound to give effect to all contractual provisions

if at all possible. We think, nonetheless, that if the Delaware Supreme Court were confronted with this dilemma, it would persist in giving the word "damages" its plain meaning. Words in an insurance policy are not always chosen with a surgeon's precision. Instead, synonyms often are grouped together to highlight a particularly salient point. In our view, the "as damages" clause, read in its entirety, collectively conveys a single point—namely, that CNA is obliged to indemnify the County for money expended under the sanction of law to redress harm to property or persons. If CNA had intended to emphasize the term "damages" by assigning it a technical meaning, it should have included in its policy a limiting definition to prevent policyholder confusion. Absent such a definition, we must interpret the term "damages" in accordance with its ordinary meaning and the County's reasonable expectation of coverage.

bilities.[57]

## C. The "Occurrence" Clause

█ Having determined that the three underlying actions against the County seek "damages because of ... property· damage," we turn to the question whether the property damage was caused by an "occurrence." An "occurrence," as we earlier noted, is an "accident" that results, during the policy period, in damage "neither expected nor intended from the standpoint of the insured." Thus, to establish coverage, the County must show that, prior to the effective date of its policies with CNA, it "neither expected nor intended" environmental damage to result from its operation of the Tybouts Corner landfill.

The district court in *New Castle II*, responding to CNA's (and the other insurers') motion for summary judgment, construed the "neither expected nor intended" language in the "occurrence" clause to bar coverage only if, before the policy period begins, "there is evidence ... indicating a *substantial probability* that a loss will occur." 685 F.Supp. at 1330 (emphasis added).[58] The district court later revisited this standard in *New Castle III*, holding as a factual matter that, prior to May of 1973 (the month in which CNA issued its first policy to the County), there was *not* a "substantial probability" that the Tybouts Corner landfill would cause off-site pollution damage. 725 F.Supp. at 816. Based on this factual finding, the district court concluded that there was an "occurrence" within the meaning of CNA's insurance policies. *Id.*

On appeal, CNA challenges the district court's findings of fact as clearly erroneous. In so doing, CNA criticizes the court's treatment of seven "pieces of evidence." CNA contends, specifically, that the court erred in concluding:

(1) that the County's routine acceptance of chemical wastes in violation of state permits was "not relevant;" (2) that the County's failure to maintain a two-foot separation between the refuse and groundwater was merely "negligent;" (3) that the County "could reasonably believe" that a continuous clay barrier existed even though the County's own expert was unsure that was so; (4) that the University of Delaware reports disclosing a clear pattern of groundwater deterioration showed that "the site did not pose a· significant danger;" (5) that the black pond incident and accompanying breakout of leachate merely "indicated the landfill was functioning as expected;" (6) that the pollution caused by

---

**57.** CNA also denies liability for "response costs" based on the "because of ... property damage" limitation in its policies. CNA asserts that claims to recover response costs seek recoupment of purely economic losses sustained in rectifying pollution damage—not compensation for property damage. CNA points out that the EPA in the *USA* action sought reimbursement of the money it had expended and will expend in investigating and cleaning up the contamination emanating from Tybouts Corner. CNA emphasizes that the EPA has not suffered damage to its own property, but rather alleges property damage simply as the factual predicate for its claim for response costs. CNA's argument is derived primarily from *Mraz v. Canadian Universal Insurance Co.,* 804 F.2d 1325 (4th Cir.1986), in which the Fourth Circuit held that the standard CGL policy does not cover EPA claims for response costs in the absence of an allegation that the EPA has suffered property damage.

The district court in *New Castle I* rejected this contention in the following passage:
> To trigger coverage under the policies, the Federal Government in *United States v. New Castle County* need not allege that it suffered

property damage. Under the terms of the policy, the underlying claim need only require the insured "to pay damages *because of* bodily injury or property damage." (emphasis added). The complaint in *United States v. New Castle County* clearly states claims for remedial action to remedy property damage, in this case harm to surface and ground waters.

673 F.Supp. at 1366 (citations omitted); *see also Chesapeake Utilities Corp.,* 704 F.Supp. at 566 (also rejecting the holding and the reasoning of *Mraz*). We have little to add to this analysis. The EPA in the *USA* action sought to recover from the County past and future sums necessary to remedy damage to neighboring property as a result of the migration of leachate from the Tybouts Corner landfill. The County's ultimate liability in that action thus is quite literally "because of ... property damage."

**58.** CNA does not challenge the district court's interpretation of the phrase "neither expected nor intended." We nonetheless point out that the court's construction appears to be entirely consistent with general principles of Delaware insurance law.

Llangollen a scant three miles away was immaterial because of "different geographic characteristics" between the two landfills; and (7) that the Winterim report was "unavailing" because it "concluded there was no immediate threat to the water supply posed by the landfill." CNA's Br. at 33–34 (citations omitted and numbers inserted). CNA declares that these mistakes, when viewed together, render clearly erroneous the district court's conclusion that pollution damage from Tybouts Corner was not "substantially probable" in May of 1973.

The County responds to CNA's seven-prong attack *seriatim*. It states, initially, that evidence concerning the disposal of chemical wastes at Tybouts Corner was not relevant because CNA failed to offer proof that such deposits increased the likelihood of property damage. With respect to CNA's allegation that it neglected to maintain the required two-foot separation between the landfill and the water table, the County protests that it was unaware that William Ward (the operator of the landfill) was depositing refuse in this manner. Similarly, the County discounts the significance of the letter of its putative expert, Clarence Turner, contending that the letter does not refute the existence of a continuous clay layer beneath the landfill, and that Turner drafted the letter in an effort to solicit additional business.

Finally, the County dismisses the claim that the University of Delaware reports, the "black pond incident," the discovery of a leachate problem at Llangollen, and the "Winterim" report should have alerted it to a likely pollution problem at Tybouts Corner. The County argues: (1) that the University reports consistently concluded that the level of contaminants at Tybouts Corner was "far below levels that normally constitute pollution;" (2) that the "black pond incident" did not indicate that a groundwater pollution problem existed at the landfill site; (3) that the Llangollen site was so dissimilar from Tybouts Corner that contamination at the former site did not mean that there was a "substantial probability" of contamination at the latter; and (4) that the "Winterim" report—which, inci-

dentally, was prepared by four college students—did not conclude that the Tybouts Corner landfill posed an immediate pollution threat to nearby groundwater.

While CNA has made a forceful argument, it is, in essence, a jury argument. Because our standard of review is deferential, *see supra* at 1183, it is not our function on appeal to review *de novo* a district court's findings of fact. We have scrutinized the district court's findings in light of both the record and the parties' contentions. Had we addressed this question in the first instance, perhaps we would have come out differently, but that is not the issue here. After studying the record, we are not left "with the definite and firm conviction that a mistake has been committed." *United States Gypsum*, 333 U.S. at 395, 68 S.Ct. at 542. Hence, we must affirm the district court's finding that, when the County purchased its policies from CNA, there was *not* a "substantial probability" that off-site environmental damage would result from the County's operation of the Tybouts Corner landfill.

### D. The "Pollution Exclusion" Clause

As mentioned above, the pollution exclusion clause in CNA's policies bars coverage for damages caused by pollution unless the pollutants were discharged suddenly and accidentally. Based on this clause, CNA (and seven other insurers) moved for summary judgment. The focal point of this motion was the meaning of the phrase "sudden and accidental," which is part of an exception to the pollution exclusion. CNA argued that the word "sudden" unambiguously has a temporal component and means "abrupt" or "brief." It contended, therefore, that the contamination from Tybouts Corner, which was due to a long-term process of discharging leachate into the groundwater, is not the type of "sudden" pollution covered by its policies. The County, on the other hand, insisted that the word "sudden" is ambiguous. In view of the general precept of Delaware law that ambiguous insurance policies are construed in favor of the insureds, *see Steigler*, 384 A.2d at 400, the County ar-

gued that the pollution exclusion clause must be interpreted to bar coverage only if the pollution damage was expected or intended.

The district court was persuaded by the County's construction of the term. After consulting numerous sources, the court concluded in *New Castle I* that the word "sudden," as used in the exception to the pollution exclusion clause, is susceptible of two reasonable interpretations—to wit, unexpected or brief. Resolving this ambiguity in favor of the insured, the district court held that "the term 'sudden' means a discharge, dispersal, release or escape of pollutants that is unexpected." 673 F.Supp. at 1364.

On appeal, CNA raises two distinct challenges to the district court's treatment of the pollution exclusion clause. First, CNA claims that the district court erroneously concluded in *New Castle I* that the word "sudden," in the context of the pollution exclusion clause, is ambiguous and thus can be defined without a temporal element. Second, CNA argues that the district court ignored the plain language of the pollution exclusion clause when, in *New Castle III*, it failed to consider whether the *discharge* of pollutants, as opposed to any resulting *damage,* was "sudden and accidental," regardless of how those terms are defined. We will examine these contentions in turn.

1. The Meaning of the Word "Sudden"

 a. *The significance of multiple dictionary definitions*

 ▬ The district court, in construing the pollution exclusion, attached considerable significance to the dictionary definition —or, more accurately, definitions—of the word "sudden":

 The primary dictionary definition of the word "sudden" is "happening without previous notice" or "occurring unexpectedly." Webster's Third New International Dictionary, at 2284 (1971); *see* Black's Law Dictionary, at 1284 (1979). While other definitions indicate that the word has connotations of brevity, this only suggests that the word has more than one reasonable definition.

673 F.Supp. at 1362–63. Noting that CNA's CGL insurance policies fail to define the term "sudden," the County insists that such lexicographic analysis was entirely proper. Indeed, it seeks to bolster the court's conclusion by citing to similar entries set forth in other leading dictionaries and thesauri.

CNA attacks the district court's reasoning on two grounds. First, it asserts that the court accorded far too much weight to the order in which definitions are listed in a dictionary. More specifically, CNA claims that the district court incorrectly inferred that the first printed meaning in an entry is the "primary dictionary definition" of the word. In this regard, CNA refers us to the explanatory notes of the dictionary that the district court cited. These notes, CNA contends, "unequivocally state[ ] that definitions are *not* presented in any order of importance." CNA's Br. at 20 (emphasis in original) (citing Webster's Third New International Dictionary 17a (1976)). Second, CNA argues that the existence of multiple dictionary definitions is, by itself, insufficient to render a word ambiguous. *See Fireman's Fund Insurance Cos. v. Ex-Cell–O Corp.,* 702 F.Supp. 1317, 1324 (E.D. Mich.1988) ("[I]f merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous. The interpretation of contractual language is not mechanical.").

We do not doubt the propriety under Delaware law of consulting a dictionary to determine whether contractual or statutory language is capable of more than one reasonable interpretation. *See Pioneer National Title Insurance Co. v. Child, Inc.,* 401 A.2d 68, 70–71 (Del.1979); *Loftus v. Hayden,* 391 A.2d 749, 752 (Del.1978); *Lamberton v. Travelers Indemnity Co.,* 325 A.2d 104, 107 (Del.Super.1974), *aff'd,* 346 A.2d 167 (Del.1975). Yet we agree with CNA's assertion that the existence of more than one dictionary definition is not the *sine qua non* of ambiguity. If it were, few words would be unambiguous. Although dictionaries are helpful insofar as they set forth the ordinary, usual meaning of words, they are imperfect yardsticks of

ambiguity. By their very nature, dictionaries define words in the abstract, whereas here, we must ascertain whether the word "sudden" is ambiguous in the context of a specific insurance policy.

That said, we do not believe that the district court ran afoul of this concern by according undue weight to the existence of multiple dictionary definitions for the word "sudden." Nor do we think that the court emphasized too heavily the order in which its dictionary listed the various definitions of "sudden." Rather, in determining whether the word sudden "permits two or more reasonable interpretations," *Hallowell*, 443 A.2d at 926, the district court simply *began* its analysis by doing that which any reasonable person would do: it looked the word up in the dictionary. Upon discovering that Webster's dictionary offers several definitions of the word "sudden," the district court quite reasonably concluded that this suggests that the "word has more than one reasonable definition." *New Castle I*, 673 F.Supp. at 1363. Having consulted the dictionary, the district court proceeded to consider other factors relevant to determining whether the word "sudden" is, in the context of CNA's policies, ambiguous. We find nothing wrong with this approach: that the word "sudden" is defined in a universally respected dictionary as meaning both "happening without previous notice" and "occurring unexpectedly" undermines CNA's assertion that the word cannot be defined without a temporal component.

b. *The rule that all words in a policy should be given effect*

Because the word "accidental" already encompasses notions of unexpectedness, CNA contends that the district court, in interpreting "sudden" also to mean "unexpected," failed to appreciate the significance of the conjunctive in the phrase "sudden *and* accidental." In so doing, CNA asserts, the district court violated the basic principle of insurance law that all words in a policy should be given effect. This argument was concisely summarized by the

Pennsylvania Superior Court in the following paragraph:

> The very use of the words "sudden *and* accidental" (emphasis added) reveal[s] a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, i.e. joined by the word "and" to the word "accident", the inescapable conclusion is that "sudden", even if including the concept of unexpectedness, also adds an additional element because "unexpectedness" is already expressed by "accident". This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage.

*Lower Paxton Township v. United States Fidelity & Guaranty Co.*, 383 Pa.Super. 558, 577, 557 A.2d 393, 402 (1989). Despite the intuitive force of this argument, we do not think that the district court's analysis was flawed in this regard.

We believe that the word "sudden," even if defined to mean "unexpected," is not completely synonymous with the word "accidental." Simply put, sudden means unexpected, and accidental means unintended. To the extent that the meanings of these words overlap, we do not think that this precluded the district court from defining sudden as unexpected. Insurance policies routinely use words that, while not strictly redundant, are somewhat synonymous.[59] For example, the exception to the pollution exclusion clause also uses the words "discharge, dispersal, release or escape"— terms that convey the same basic idea, with only slightly different permutations. We think that the words "sudden" and "accidental," when read together, serve the same purpose as "discharge, dispersal, release or escape": they each connote the same general concept—namely, fortuity— with a small variation. Neither do we think that annexing the word "sudden" to the word "accidental" with the conjunctive "and" necessarily injects a temporal ele-

---

**59.** This point is also made *supra* n. 56.

ment, such as brevity or abruptness, into the exception to the pollution exclusion clause.

### c. *The existence of judicial disagreement*

To fortify their contentions, both the County and CNA have marshaled an arsenal of case law in support of their respective definitions of the word "sudden." Each insists that the trend in other jurisdic-

tions is to construe the "sudden and accidental" exception to the pollution exclusion clause consistent with their arguments here. Although the cases assembled by the parties are legion, we discern neither a noticeable trend nor a majority position. Rather, the authority appears to be evenly divided between the parties' competing constructions of the pollution exclusion clause, with about half of the cases holding that the clause bars coverage,[60] and with the other half holding that it does not.[61] Given

**60.** *See, e.g., Hayes v. Maryland Casualty Co.,* 688 F.Supp. 1513 (N.D.Fla.1988); *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.,* 168 Ill.App.3d 361, 119 Ill.Dec. 96, 522 N.E.2d 758, *appeal denied,* 122 Ill.2d 576, 125 Ill.Dec. 218, 530 N.E.2d 246 (1988); *Barmet of Indiana, Inc. v. Security Insurance Group,* 425 N.E.2d 201 (Ind.Ct.App.1981); *American Motorists Insurance Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987); *United States Fidelity & Guaranty Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990); *United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988) (Kentucky law); *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *FL Aerospace v. Aetna Casualty & Surety Co.,* 897 F.2d 214 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990) (Michigan law); *Fireman's Fund Insurance Cos. v. Ex-Cell-O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988); *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *Great Lakes Container Corp. v. National Union Fire Insurance Co.,* 727 F.2d 30 (1st Cir. 1984) (New Hampshire law); *Technicon Electronics Corp. v. American Home Assurance Co.,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989); *Ogden v. Travelers Indemnity Co.,* 924 F.2d 39 (2d Cir.1991); *EAD Metallurgical, Inc. v. Aetna Casualty & Surety Co.,* 701 F.Supp. 399 (W.D.N.Y.1988), *aff'd,* 905 F.2d 8 (2d Cir.1990); *New York v. Amro Realty Corp.,* 697 F.Supp. 99 (N.D.N.Y.1988); *Borden, Inc. v. Affiliated FM Insurance Co.,* 682 F.Supp. 927 (S.D.Ohio 1987), *aff'd,* 865 F.2d 1267, *cert. denied,* —— U.S. ——, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989); *Transamerica Insurance Co. v. Sunnes,* 77 Or.App. 136, 711 P.2d 212 (1985), *review denied,* 301 Or. 76, 717 P.2d 631 (1986); *Centennial Insurance Co. v. Lumbermens Mutual Casualty Co.,* 677 F.Supp. 342 (E.D.Pa.1987); *Fischer & Porter Co. v. Liberty Mutual Insurance Co.,* 656 F.Supp. 132 (E.D.Pa.1986); *American Mutual Liability Insurance Co. v. Neville Chemical Co.,* 650 F.Supp. 929 (W.D.Pa.1987); *Lower Paxton Township v. United States Fidelity & Guaranty Co.,* 383 Pa.Super. 558, 557 A.2d 393 (1989); *Techalloy Co. v. Reliance Insurance Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984); *CPI International, Inc. v. Northbrook Excess & Surplus Insurance Co.,* 759 F.Supp. 966 (D.R.I.1991) (New Jersey law);

*United States Fidelity & Guaranty Co. v. Murray Ohio Mfg. Co.,* 693 F.Supp. 617 (M.D.Tenn.1988), *aff'd,* 875 F.2d 868 (6th Cir.1989).

**61.** *See, e.g., City of Northglenn v. Chevron U.S.A., Inc.,* 634 F.Supp. 217 (D.Colo.1986); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guaranty Co.,* 668 F.Supp. 1541 (S.D.Fla.1987); *Payne v. United States Fidelity & Guaranty Co.,* 625 F.Supp. 1189 (S.D.Fla.1985); *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989); *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.,* 180 Ill. App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071, *appeal denied,* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *Reliance Insurance Co. v. Martin,* 126 Ill.App.3d 94, 81 Ill.Dec. 587, 467 N.E.2d 287 (1984); *Allstate Insurance Co. v. Quinn Construction Co.,* 713 F.Supp. 35 (D.Mass. 1989); *Travelers Indemnity Co. v. Dingwell,* 414 A.2d 220 (Me.1980); *Jonesville Products, Inc. v. Transamerica Insurance Group,* 156 Mich.App. 508, 402 N.W.2d 46 (1986), *appeal denied,* 428 Mich. 895 (1987); *Polkow v. Citizens Insurance Co.,* 180 Mich.App. 651, 447 N.W.2d 853 (1989); *Grinnell Mutual Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495 (Minn.App.1988); *United States v. Conservation Chemical Co.,* 653 F.Supp. 152 (W.D.Mo.1986); *Du-Wel Products, Inc. v. United States Fire Insurance Co.,* 236 N.J.Super. 349, 565 A.2d 1113 (1989), *cert. denied,* 121 N.J. 617, 583 A.2d 316 (1990); *Summit Associates, Inc. v. Liberty Mutual Fire Insurance Co.,* 229 N.J.Super. 56, 550 A.2d 1235 (1988); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (1987); *Jackson Township v. Hartford Accident & Indemnity Co.,* 186 N.J.Super. 156, 451 A.2d 990 (1982); *Avondale Industries, Inc. v. Travelers Indemnity Co.,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *National Grange Mutual Insurance Co. v. Continental Casualty Insurance Co.,* 650 F.Supp. 1404 (S.D.N.Y.1986); *Colonie Motors, Inc. v. Hartford Accident & Indemnity Co.,* 145 A.D.2d 180, 538 N.Y.S.2d 630 (1989); *Allstate Insurance Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603 (1980); *Kipin Industries v. American Universal Insurance Co.,* 41 Ohio App.3d 228, 535 N.E.2d 334 (1987); *Buckeye*

the facts that (1) this is a first impression question of Delaware law; (2) this court previously has not resolved this issue; and (3) the cases from other jurisdictions seem to be in equipoise, lengthy string cites provide us with little guidance.

■ Seizing on the division of authority, the County argues that the existence of a national judicial split is evidence, in-and-of-itself, that the "sudden and accidental" language is ambiguous. *See Little v. MGIC Indemnity Corp.*, 836 F.2d 789, 796 (3d Cir.1987) ("that different courts have arrived at conflicting interpretations of [a] policy is strongly indicative of the policy's essential ambiguity"). We agree with this assertion to a certain extent. Although the presence of conflicting judicial decisions does not automatically mandate a finding of ambiguity, *see Lower Paxton*, 383 Pa. Super. at 573 n. 4, 557 A.2d at 400 n. 4, we think that it has some relevance. We are confronted here with two contrasting lines of cases: one holding that the word "sudden" is ambiguous and thus means "unexpected," and another holding that the word "sudden" always has a temporal quality and thus means "abrupt" or "brief." While it is our responsibility to ascertain which of these lines is most likely to be followed in Delaware, we cannot help but view such a division as at least suggesting that the term "sudden" is susceptible of more than one reasonable definition.

### d. *The drafting and marketing history of the pollution exclusion clause*

The County strenuously argues that the public record underlying the development, marketing, and regulatory approval of the pollution exclusion contradicts CNA's temporal construction of the clause. CNA, on the other hand, urges us to refrain from exploring this history because, it claims,

the language of the clause is facially unambiguous. In light of the multiplicity of dictionary definitions of the word "sudden" and the inability of courts nationwide to agree upon a single construction of the term, we think that it is appropriate to trace the history of the pollution exclusion clause. More importantly, the Delaware Superior Court recently· determined in *E.I. du Pont de Nemours & Co. v. Admiral Insurance Co.*, No. 89C–AU–99, 1990 WL 14100 (Del.Super. Sept. 19, 1990), that, under Delaware law, a court "must consider the context and circumstances surrounding the meaning of what otherwise appears to be clear and unambiguous ... language." Slip op. at 14–15 (granting plaintiff du Pont's motion to compel discovery of the drafting history of "absolute" pollution exclusions even though those exclusions appeared to be "clear and unambiguous" on their face).[62]

The district court record reveals that, prior to 1966, the standard CGL policy covered bodily injury and property damage "caused by accident." Although these early policies did not define the word "accident," insurers, hoping to limit coverage to brief catastrophic events, argued that the term did not embrace gradual damage. This argument, however, was roundly rejected by the judiciary, which instead held that "accident" policies covered unintended injury or damage resulting from, among other things, extended exposure to pollutants. *See, e.g., Moffat v. Metropolitan Casualty Insurance Co.*, 238 F.Supp. 165, 172–73 (M.D.Pa.1964).

In acknowledgment of the prevailing case law, the insurance industry in 1966 increased premiums and switched to "occurrence-based" coverage. The standard policy defined an occurrence as " 'an accident, including continuous or repeated ex-

---

*Union Insurance Co. v. Liberty Solvents & Chemicals Co.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984); *Benedictine Sisters of St. Mary's Hospital v. St. Paul Fire & Marine Insurance Co.*, 815 F.2d 1209 (8th Cir.1987); *United Pacific Insurance Co. v. Van's Westlake Union, Inc.*, 34 Wash.App. 708, 664 P.2d 1262, *review denied*, 100 Wash.2d 1018 (1983); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 456 N.W.2d 570 (1990); *Compass*

*Insurance Co. v. Cravens, Dargan & Co.*, 748 P.2d 724 (Wyo.1988).

**62.** *Accord Haeberle v. Texas International Airlines*, 738 F.2d 1434, 1439 (5th Cir.1984) ("clarity or ambiguity of a document should not be assessed from its four corners alone, but in the light of the circumstances surrounding its adoption").

posure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'" Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo.L.J. 1237, 1246–47 (1986). The standard, occurrence-based policy thus covered property damage resulting from gradual pollution. So long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants. *Id.* at 1250.

The parties' respective accounts of the history begin to diverge at around 1970. At that time, amid growing public awareness of the deleterious environmental effects of pollution, insurers again changed their insurance policies. In particular, they tacked the pollution exclusion clause onto their occurrence-based policies, thereby disclaiming coverage for damage arising out of the discharge of pollutants. As we have emphasized throughout this opinion, however, this exclusion does not apply if such discharge is "sudden and accidental."

According to the County, the insurers appended this exclusion onto their policies in order to reaffirm existing limits on pollution coverage, thus distancing themselves in the public mind from deliberate polluters. Because coverage for intentional pollution already was excluded by the "occurrence" language, the County claims, the addition of the pollution exclusion clause was intended merely to clarify (or reinforce) preexisting limits on coverage. CNA, of course, advances a different version of events. It asserts that the pollution exclusion clause was added in order to reintroduce the temporal requirement of suddenness, which had been deleted when insurers shifted from an accident-based policy to one that was occurrence-based. Additionally, as is discussed at length *infra* in

Part IV.D.2., CNA contends that the pollution exclusion clause was intended to recast CGL policies' focus from the loss to the discharge: that is, pollution damage henceforth was covered only if the *discharge* of pollutants, not the resulting loss, was "sudden and accidental."

The phrase "sudden and accidental" was not new to the insurance industry. For many years, it had been used in the standard boiler and machinery policy,[63] and the courts uniformly had construed the phrase to mean unexpected and unintended. *See, e.g., Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.,* 53 Wash.2d 404, 333 P.2d 938 (1959); *New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp.,* 330 Mass. 640, 116 N.E.2d 671 (1953); *see also* 10A G. Couch, *Couch on Insurance 2d* § 42:396, at 505 (M. Rhodes rev. 2d ed. 1982) ("When coverage is limited to a sudden 'breaking' of machinery the word 'sudden' should be given its primary meaning as a happening without previous notice, or as something coming or occurring unexpectedly, as unforeseen or unprepared for. That is, 'sudden' is not to be construed as synonymous with instantaneous." (footnote omitted)).[64] We think that it is reasonable to assume that the insurance industry was aware of this construction when it chose to use the phrase "sudden and accidental" in the pollution exclusion clause. *See* 2 G. Couch, *Couch on Insurance 2d* § 15:20, at 195–96 (M. Rhodes rev. 2d ed. 1984) ("The judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties.").

This history is reinforced by the representations made by insurance industry officials to state authorities in an effort to gain regulatory approval of the pollution exclusion clause. Insurance company executives

---

**63.** The standard boiler and machinery policy defined the word "accident" as "a sudden and accidental breaking, deforming, burning out or rupturing of the Object or any part thereof, which immediately impairs the functions of the Object and necessitates repair or replacement before its functions can be restored."

**64.** *But see* Johnson & Ansell, *Insured Counsel Doubletalk: The Fallacies in Anderson and Passannante's Arguments Concerning the Interpretation of "Sudden and Accidental" in Boiler and Machinery Policies,* Mealey's Litigation Reports—Insurance 18 (Jan. 15, 1991).

stated that the language of the clause was a mere clarification of the "occurrence" definition, excluding coverage only for expected or intended pollution. The standard explanatory memorandum submitted by the IRB to state insurance commissioners noted that:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused by injuries where the pollution or contamination results from an accident. . . .

See, e.g., app. at 3173 (Memorandum to George F. Reed, Pennsylvania Commissioner of Insurance, dated May 8, 1970).[65] That insurers publicly marketed the exclusion as a clarification, rather than a restriction of coverage, further indicates that "sudden and accidental" may mean, as the County suggests, unexpected and unintended. At the very least, we think that such comments on the part of the insurers corroborate the County's claim that the phrase is ambiguous.

Although we do not believe that the history of the pollution exclusion clause alone demonstrates that the phrase "sudden and accidental" is ambiguous, it does appear to contradict CNA's assertion that the phrase necessarily connotes brevity or abruptness. Both the meaning ascribed to the phrase when it was part of the standard boiler and machinery policy and the public statements of insurance executives in the early 1970s regarding the function of the clause suggest that "sudden and accidental" in the context of this policy may mean unexpected and unintended. In short, the evidence concerning the origin of the pollution exclusion clause, though far from conclusive,

implies that the County's interpretation of the clause is at least plausible, if not plainly correct.

### e. Conclusion

When first confronted with this issue, the reader's initial reaction is likely to be that "sudden" means "abrupt." Upon considering the foregoing factors, however, we now are convinced that the County's alternative interpretation of "sudden" (as meaning "unexpected") "reflect[s] a reasonable reading of the contractual language." Kenner, 570 A.2d at 1174. Our dictionaries, like the district court's, define "sudden" both with and without a temporal element, thus lending considerable weight to the County's assertion that either interpretation is reasonable. We also are impressed by the profound judicial disagreement over the meaning of the phrase "sudden and accidental." That so many learned jurists throughout the nation differ on the construction of this phrase is, in our view, additional proof that the phrase admits of two reasonable constructions. Lastly, we think that the history of the pollution exclusion clause quells all remaining doubts that the phrase "sudden and accidental," in the context of post–1970 CGL policies, can reasonably be construed to mean "unexpected and unintended." Not only is that the meaning that was ascribed to the phrase when it first appeared in boiler and machinery policies, but it also is consistent with the insurance industry's contemporaneous representations to state insurance commissioners.

Because the term "sudden" appears capable of two reasonable interpretations ("abrupt" and "unexpected"), we conclude that the term is ambiguous under Delaware law. The dictates of that state's insurance law therefore require us to resolve this ambiguity in favor of the County by

---

**65.** See also Letter from R. Stanley Smith, Manager of the IRB, to the Georgia Insurance Department dated June 10, 1970, quoted in Claussen v. Aetna Casualty & Surety Co., 676 F.Supp. 1571, 1573 (S.D.Ga.1987), question certified, 865 F.2d 1217 (11th Cir.1989):

> [T]he impact of the [pollution exclusion clause] on the vast majority of risks would be no change. It is rather a situation of clarification . . . Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued. . . .

construing "sudden" to mean "unexpected." Contrary to CNA's intimations, we do not think that such a construction renders the word "accidental" mere surplusage. *See supra* at 1194–1195.[66] Nor do we think that our decision is at odds with that of the Delaware Court of Chancery in *Artesian Water Co. v. New Castle County.*[67] We turn therefore to CNA's second challenge to the district court's treatment of the pollution exclusion clause.

#### 2. The Damage/Discharge Distinction

The district court in *New Castle I* summarized its holding regarding the meaning of the word "sudden" as follows:

> [T]he plain meaning of the word "sudden" as used in the pollution exclusion is ambiguous. Resolving the ambiguity in favor of the insured, the Court rules that the term "sudden" means a *discharge, dispersal, release or escape of pollutants* that is unexpected.

673 F.Supp. at 1364. We agree. Nearly two years later, however, the district court in *New Castle III* appears to have confused the point a bit.

To determine whether CNA owed a duty to defend and indemnify the County, the district court in *New Castle III* first noted that the "occurrence" clause requires that the property damage be unexpected and unintended. Then, recalling that the phrase "sudden and accidental" in the pollution exclusion clause also means unexpected and unintended, the district court synthesized the "occurrence" and pollution exclusion clauses into a single standard: "The Court ... concludes that the term 'occurrence' and the pollution exclusion clause are coextensive." 725 F.Supp. at 813 (citations omitted). Because the "occurrence" clause focuses on *damages*, whereas the pollution exclusion clause focuses on *discharges*, we fear that the district court may unwittingly have conflated two distinguishable inquiries.

On appeal, CNA forcefully advances this point. "Even a cursory reading of the two

---

**66.** CNA also contends that the County itself acknowledged the applicability of the pollution exclusion clause when its Risk Manager, James Nolan, stated in a November, 1982 letter that he was "certain that the [*Wagner*] suit is 'excluded' due to the pollution clause." App. at 3230. The district court in *New Castle I* found this argument unpersuasive: "The Risk Manager is a lay person and in addition he gives no explanation of how he reached his conclusion." 673 F.Supp. at 1364. We agree.

**67.** In *Artesian Water Co. v. New Castle County,* No. 83–5106, 1983 WL 17986 (Del.Ch. Aug. 4, 1983), a water company sued the County, claiming that its water supply had been polluted by the Llangollen landfill. *See supra* n. 15. The County, as a defense to this action, invoked the doctrine of sovereign immunity. However, by statute in Delaware, there is no immunity if the government's liability arose from the sudden release of pollutants. *See* Del.Code Ann. tit. 10, § 4012(3) (Supp.1988). Interestingly, the County, in sharp contrast to the position it has taken here, argued in *Artesian* that this exception to the grant of immunity was inapplicable "because the leachate contamination ha[d] been gradual and continual and *not* sudden." Slip op. at 21 (emphasis added). Persuaded by the County's argument, the Delaware Court of Chancery stated: "The leachate contamination at issue has been ongoing for more than a decade and can hardly be characterized as sudden." *Id.*

CNA seizes upon the County's apparent about-face for all of its tactical worth. First, CNA raises a judicial estoppel argument, claiming that the County should not be allowed to reverse field whenever its self-interest so dictates. Second, CNA maintains that, insofar as a Delaware court has construed "sudden" to have a temporal meaning, the *Artesian* case has precedential value to the dispute at bar.

Although we are discomfited by the seemingly inconsistent positions advanced by the County, we do not think that the *Artesian* case undermines the County's argument here. Statutory waivers of sovereign immunity are subject to different rules of construction than those that govern exceptions to insurance exclusions: whereas waivers of immunity are construed narrowly so as to facilitate immunity, *see Sadler v. New Castle County,* 565 A.2d 917, 923 (Del. 1989); *Borenstein v. City of Philadelphia,* 595 F.Supp. 853, 859 (E.D.Pa.1984), exceptions to insurance exclusions are construed broadly so as to maximize coverage, *see Hallowell,* 443 A.2d at 926–27. Accordingly, the *Artesian* court was in a different interpretive posture than are we. While the *Artesian* court may have been at liberty to overlook a latent ambiguity in the word "sudden," we are not. Instead, we are obligated under Delaware law to construe all ambiguities against the insurer. We therefore conclude that the *Artesian* case is not controlling on the issue *sub judice,* and that the County's arguments before the Delaware Chancery Court and before us are not fatally inconsistent.

clauses," CNA contends, "compels the conclusion that the pollution exclusion clause covers 'discharges' of pollutants, whereas the occurrence clause covers the resulting 'damages.'" CNA's Reply Br. at 4. Because the district court did not draw the damage/discharge distinction, CNA argues that the court never specifically considered whether the *discharge* of contaminants from Tybouts Corner landfill, as opposed to any resulting off-site property damage, was sudden and accidental, regardless of how those terms are defined.

### a. *The case law*

Several recent cases have embraced the damage/discharge distinction, holding that the occurrence and pollution exclusion clauses are not co-extensive. In *Transamerica Insurance Co. v. Sunnes*, 77 Or. App. 136, 711 P.2d 212 (1985), *review denied*, 301 Or. 76, 717 P.2d 631 (1986), for example, an insurance company commenced a declaratory judgment action to ascertain whether it owed a duty to defend and indemnify an insured that had damaged the local sewage disposal system by intentionally discharging acid wastes. The insured argued that, because the resulting damage to the sewer lines was unexpected, it was covered notwithstanding that its discharge was intentional. The Court of Appeals of Oregon, relying expressly on the damage/discharge distinction, rejected this argument:

> [The insured] misreads and confuses the policy provisions. The fact that the *damage* was not intended means that there was an "occurrence" within the policy definition. That fact has nothing to do with whether the *discharge* was "sudden and accidental" for the purpose of applying the exception to the exclusion.

77 Or.App. at 140, 711 P.2d at 214 (emphases in original).

Similarly, the Sixth Circuit in *United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 34 (6th Cir. 1988), pointed out that it is irrelevant under the pollution exclusion clause whether the damage resulting from the discharge of pollutants was unintended and unexpected. Instead, the court emphasized, the focus of the "sudden and accidental" exception to the clause "is on the nature of the discharge of the pollution itself, not on the nature of the damages caused." *Id.* As a result, "the ultimate question [under the pollution exclusion clause] is whether the *discharges* of [pollutants] were sudden and accidental." *Id.* at 35 (emphasis in original).

But perhaps the most thorough discussion of the damage/discharge distinction is found in *In re Acushnet River & New Bedford Harbor*, 725 F.Supp. 1264 (D.Mass.1989):

> [T]he Court rejects the ... argument that the pollution exclusion is a mere restatement of the word "occurrence" as that term is used in the policy.... There is an occurrence under the policy if the damage was not intended but was caused by an intentional act. *The pollution exclusion focuses on the discharge, not the resulting property damage....* Thus, in the context of pollution or contamination, an insured can point to non-expected or non-intended property damage, and therefore can have an occurrence under the policy and yet still be excluded from coverage on the ground the initial release or discharge was expected, intended, or non-sudden. *In order to obtain coverage under the policies in question, both the property damage and the initial release or discharge must be unexpected or unintended and, further, the initial release must be sudden.*

*Id.* at 1268–69 n. 8 (emphases added and citations omitted).[68]

**68.** *See also Liberty Mutual Insurance Co. v. Triangle Industries, Inc.,* No. 88–0041–W(K) 1991 WL 91031 (N.D.W.Va. Mar. 12, 1991) ("[The insured's] argument that it did not expect nor intend the property damage at the Buckeye Landfill does not relieve it from the pollution exclusion clause of the CGL policies. Unlike the definition of 'occurrence,' which focuses on the property damage, the pollution exclusion clause language focuses on the discharge, dispersal, release or escape of pollutants. To hold otherwise would eviscerate the pollution exclusion

b. *The history of the pollution exclusion: does it shed any light on the import of the damage/discharge distinction?*

Our emphasis on the damage/discharge distinction might be said to contradict our prior discussion of the history of the pollution exclusion clause. In holding that the phrase "sudden and accidental" can be interpreted to mean "unexpected and unintended," we identified evidence indicating that the pollution exclusion was proffered to state insurance regulators as a clarification, rather than a curtailment, of the coverage provided by the "occurrence" clause. *See supra* at 1197–1198. Accordingly, if "sudden" was intended to mean "unexpected," then perhaps the word "discharge" was similarly intended to mean "damage." Although we recognize this apparent tension, we nonetheless think that the district court short shrifted the damage/discharge distinction. Several factors persuade us that, while "sudden" may mean "unexpected," the "occurrence" and pollution exclusion clauses have different focuses.

To begin with, the insurance industry's remarks to state officials regarding the purported purpose of the pollution exclusion clause are just one component of the clause's relevant history. We also were impressed by evidence that the phrase "sudden and accidental" was construed to mean "unexpected and unintended" when it was included in the standard boiler and machinery policy. The County, however, does not offer corresponding evidence that the word "discharge" previously has been interpreted to mean "damage." In the absence of such evidence, we think that the history of the clause is at best inconclusive with respect to the damage/discharge distinction. It is possible, in our view, that the pollution exclusion clause shifted the critical focus from damage to discharge, but did not, at the same time, introduce a temporal element into that inquiry through the use of the word "sudden."

Additionally, we think that the term pollution "exclusion" suggests that the insurance industry intended to restrict coverage, at least in some small way, when it added the pollution exclusion clause to the standard CGL policy. Delaware law, of course, requires us to construe contracts as a whole, giving effect, if possible, to all contractual provisions. *See Shell Oil*, 498 A.2d at 1113. To accord the pollution exclusion clause some independent effect as an "exclusion," we believe that the damage/discharge distinction must be respected. Otherwise, the pollution exclusion clause does not exclude anything that is not already excluded by the definition of

---

clause." (citation omitted)); *United States Fidelity & Guaranty Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 447 (D.Kan.1990) ("An ... obvious distinction between the two policy provisions is that the 'occurrence' definition addresses the harm caused by pollution while the exclusion is concerned with the act of releasing or discharging the pollutants."); *Lumbermens Mutual Casualty Co. v. Belleville Industries*, 407 Mass. 675, 679, 555 N.E.2d 568, 571 (1990) ("The sudden event to which the exception in the pollution exclusion clause applies concerns neither the cause of the release of a pollutant nor the damage caused by the release. It is the release of pollutants itself that must have occurred suddenly, if the exception is to apply so as to provide coverage. The exception thus focuses on the circumstances of the release. In deciding whether there was an occurrence, on the other hand, the focus of the inquiry is on the property damage, asking whether it was expected or intended from the insured's point of view."); *Technicon Electronics Corp. v. American Home Assurance Co.*, 74 N.Y.2d 66, 75, 544

N.Y.S.2d 531, 533–34, 542 N.E.2d 1048, 1050 (1989) ("the pollution exclusion clause, by its own terms, does not distinguish between intended or unintended consequences of intentional discharges; rather, it excludes from coverage liability based on all *intentional* discharges of waste whether consequential damages were intended or unintended" (emphasis in original)); *Fireman's Fund Insurance Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 75–76 (E.D.Mich.1987) ("Application of the pollution exclusion depends exclusively upon the process by which pollutants entered the environment. The decisive inquiry is not whether the policyholders anticipated property damage, or whether they regularly disposed of hazardous waste, but whether the pollutants entered the environment unexpectedly and unintentionally." (citation omitted)); *Jonesville Products, Inc. v. Transamerica Insurance Group*, 156 Mich.App. 508, 512, 402 N.W.2d 46, 48 (1986) ("The pollution exclusion focuses on the *release* of pollutants...." (emphasis in original)), *appeal denied*, 428 Mich. 897 (1987).

"occurrence."[69] Such a construction, we think, is entirely consistent with the insurers' underlying intent to distance themselves from deliberate polluters—i.e., those who intentionally or knowingly discharge pollutants into the environment.

Furthermore, if a term is unambiguous, we are bound by its plain meaning. The word "discharge," as it ordinarily is used, is not synonymous with "damage." Absent some proof that the term "discharge" is assigned a special meaning in the insurance industry, we must interpret it in accordance with its common usage. With this rule in mind, we think that, whatever the meaning of "sudden," the plain language of the "sudden and accidental" exception to the pollution exclusion focuses on the nature of the discharge, not on the resulting environmental damage.

### c. The economic rationale underlying the damage/discharge distinction

It is useful to consider whether the distinction between those who unexpectedly cause environmental damage and those who unexpectedly discharge pollutants is a meaningful one. We think that it is, for there is a sound economic reason why the insurance industry might insure the latter, while simultaneously excluding the former. We believe that the following hypotheticals, both involving a city that manages a municipal landfill, help to underscore this point.

Our first hypothetical city is insured for all unexpected pollution *damage*. Although it expects its landfill to discharge leachate into the environment, it does not expect the leachate to cause any appreciable property damage. Because this city is insured if any unexpected damage results, it has no incentive to improve the design or operation of its landfill. The second city, on the other hand, is insured only for pollution damage that arises from an unexpected *discharge* of pollutants. Therefore,

if this city knows that its landfill is discharging leachate, it is not insured for any ensuing property damage, regardless of whether the damage is expected or not. Given that it would not be covered for any consequential damage, the second city, once it realizes that its landfill is discharging pollutants, has a strong incentive to take precautions designed to minimize the risk of environmental damage. Simply put, the first scenario presents a moral hazard; the second does not. Viewed through this economic prism, we believe that it would be eminently rational for an insurer to underwrite the risk of pollution damage posed by the second city, but not the risk posed by the first.

### d. Evidence suggesting that the discharge of leachate from Tybouts Corner was not unexpected

The damage/discharge distinction could prove dispositive in this case. There is evidence in the record from which a rational trier of fact could infer that the County, although not expecting the Tybouts Corner landfill to produce off-site environmental damage, did expect the landfill to discharge leachate into or upon the land, or any watercourse or body of water.

Several events, prior to the County's purchase of its first insurance policy from CNA, could have alerted the County that the Tybouts Corner landfill would discharge (or was discharging) leachate. Before the landfill opened in 1969, Dr. Robert Varrin, a University of Delaware professor, apprised the County that "[s]ome amount of leachate from the fill will reach Pigeon Run through the ground pathway." App. at 1269. After Tybouts Corner became operational, several of the University's reports for the years 1969 through 1971 depicted a gradual deterioration in groundwater quality around the landfill site.[70] Shortly after Tybouts Corner land-

**69.** *See* B. Ostrager & T. Newman, *Handbook on Insurance Coverage Disputes* § 8.02, at 234 (3d ed. 1990) ("[T]he proper starting point for an analysis of the operative effect of any pollution exclusion clause is the recognition that a pollution exclusion, like any other exclusion, oper-

ates to exclude coverage for acts which are otherwise insured.").

**70.** Although the University's first report noted only a "slight deterioration in water quality," *see* app. at 2978, 3389, later reports stated that

fill closed in 1971, the "black pond incident" and the accompanying surface leachate seepages prompted the University to remark that the "problem at Tybouts Corner sanitary landfill did not appear to be under control," app. at 3071; and, a few months later, the "Winterim" report, which ultimately was sent to the County, indicated that the landfill was leaching into a pond and nearby stream.

We do not gainsay, of course, that there may be countervailing evidence. This matter was not given a great deal of attention in the district court, so it may be that the County has a convincing case that it did not expect the Tybouts Corner landfill to discharge leachate. At this juncture, however, we simply identify this important problem.

#### e. *Conclusion*

In sum, we believe that the damage/discharge distinction is deserving of significantly more attention than it was accorded by the district court. In concluding that the "occurrence" and pollution exclusion clauses are co-extensive, the district court relied entirely on the fact that, as interpreted in the context of the standard CGL policy, the phrases "neither expected nor intended" and "sudden and accidental" are roughly synonymous. This was reversible error, for the court failed to examine the equally important point that the "occurrence" and pollution exclusion clauses, by their plain language, prescribe different inquiries: the "occurrence" clause focuses on "damage," whereas the pollution exclusion focuses on "discharge." Because the district court never took notice of the damage/discharge distinction, it also never considered whether the County expected the Tybouts Corner landfill to discharge leachate. Rather, the court simply inquired whether the County expected the landfill to cause damage to nearby properties. This was insufficient under CNA's contracts of insurance. We therefore reverse and re-

mand for further proceedings consistent with this opinion.

This remand does not necessarily require a new trial. The district court in the first instance should delve back into the record and attempt to ascertain whether the County expected the Tybouts Corner landfill to discharge leachate. If necessary, however, the district court is free to supplement the current record by receiving additional testimony or submissions.

### V. CNA'S CROSS–CLAIMS

#### A. *The Timeliness of CNA's Cross–Claims Under the Parties' February 1986 Stipulation*

Lastly, CNA urges us to reverse the district court's order dismissing as untimely its cross-claims against five co-defendant insurance carriers that already had settled with the County. CNA maintains that these cross-claims were timely, because they were filed in accordance with paragraph 3(c) of the parties' February 1986 Stipulation. This paragraph provides that: "any insurer party shall be permitted as of right to file cross-claims against any other insurer party within thirty (30) days if that first insurer party is held to owe *any duty* to New Castle County with respect to the subject matter of this lawsuit." (Emphasis added).

Construing the "any duty" language in paragraph 3(c) of the stipulation, the district court stated that its decision in *New Castle I* had imposed on CNA the duty to defend the County and thus had triggered the thirty-day window for filing cross-claims. *New Castle IV*, 728 F.Supp. at 324. From this premise, the district court reasoned that the period for asserting cross-claims under the February 1986 Stipulation had expired on December 2, 1987 (thirty days after its judgment in *New Castle I* was entered), and that CNA's cross-claims, which were asserted on November 21, 1989, were filed out of time. *Id.*

"there are definite indications of groundwater deterioration from landfill leachate under the

landfill site," app. at 3070, 3390.

CNA does not quibble with the district court's arithmetic; rather, it contends that the district court erred in holding that *New Castle I* imposed on the insurance carriers a duty to defend the County. CNA asserts that the court in *New Castle I* had before it only two discrete legal issues: namely, the insurers' defenses based on the pollution exclusion and "as damages" clauses. The district court, CNA submits, did nothing more in *New Castle I* than reject the insurers' construction of those two clauses and deny their motions for summary judgment. Instead, CNA argues that the district court first imposed a duty on an insurance carrier in *New Castle III,* and that its cross-claims were properly asserted within the next thirty days.

Our review of the district court's dismissal, which was predicated on essentially legal grounds, is plenary. *See Napier v. Thirty Or More Unidentified Federal Agents,* 855 F.2d 1080, 1085 (3d Cir.1988) (review involving question of law is plenary). We believe that the district court erred in holding that *New Castle I* imposed a duty to defend on CNA.

In dismissing CNA's cross-claims, the district court relied on the following paragraph in *New Castle I:*

> As the Court holds that insofar as the two issues now before it, the insurers have a duty to indemnify the County for the six underlying claims, the Court also concludes that regarding these two questions of law the insurers are obligated to defend the County in the five underlying lawsuits. Under Delaware law an insurer's duty to defend under the policy is broader than its duty to indemnify. The insurers are required to defend any action which potentially states a claim which is covered under the policy. Because the claims at issue fall within the insurers' duty to indemnify, they clearly fall within the insurers' duty to defend.

673 F.Supp. at 1366–67 (citations omitted). If this paragraph is read in isolation, it appears to support the district court's *ex post* interpretation of *New Castle I* as im-

posing on CNA a duty to defend. However, this passage, like any other paragraph in an opinion, cannot be read in a vacuum, for it draws much of its meaning from the context in which it is set. As CNA points out, the district court in *New Castle I* was confronted with the insurers' summary judgment motions based on the pollution exclusion and "as damages" clauses. In the preceding pages of its opinion, the district court had explained that, insofar as those clauses were concerned, genuine issues of material fact existed regarding the insurers' duty to indemnify the County. Then, in the disputed paragraph, the district court simply stated that, because the duty to defend is broader than the duty to indemnify, *a fortiori* genuine issues of material fact also existed regarding the duty to defend. Indeed, nothing in the opinion (other than the above quoted paragraph) suggests that *New Castle I* formally imposed on the insurers a duty to defend.

We also are guided in construing this language by the clear terms of the district court's order accompanying its opinion in *New Castle I.* To determine what action a trial court has taken, appellate courts generally look to orders, not to the texts of opinions. The Fourth Circuit's decision in *Murdaugh Volkswagen v. First National Bank of South Carolina,* 741 F.2d 41 (4th Cir.1984), illustrates this basic principle. There, the court was confronted with an apparent conflict between the district court's statements to counsel and its order. In resolving this tension in favor of the latter, the *Murdaugh* court stated:

> Courts must speak by orders and judgments, not by opinions, whether written or oral, or by chance observations or expressed intentions made by courts during, before or after trial, or during argument. When the terms of a judgment conflict with either a written or oral opinion or observation, the judgment must govern.

*Id.* at 44.[71] The order accompanying *New Castle I* merely denies the insurers' sum-

---

**71.** *See also Starns v. Avent,* 96 B.R. 620, 630 (M.D.La.1989) (citing other cases holding that a

court's formal order, not its oral expressions, controls), *aff'd,* 891 F.2d 583 (5th Cir.), *cert.*

mary judgment motions; it does not impose any duty on the insurers.[72] This point is underscored by comparing this order with the October 23rd Order accompanying the district court's opinion in *New Castle III*, which specifically provides that CNA owes a duty to defend and indemnify the County. We therefore conclude that the October 23rd Order was the first order that imposed any duty upon CNA, and that CNA's cross-claims, which were asserted twenty-nine days later, were timely filed under paragraph 3(c) of the February 1986 Stipulation.[73]

## B. The "Settlement Bar" Issue

▪ Interestingly, the five appellee insurance carriers (the "Carrier Appellees") against which CNA asserted its cross-claims appear to concede that CNA's cross-claims were timely filed. They instead argue that these cross-claims suffer from a far more fatal infirmity and should be dismissed *with* prejudice. The gist of the Carrier Appellees' challenge is that their respective settlements with the County barred CNA's claims for contribution as a matter of substantive law and public policy. We believe that, in the absence of a cross-

appeal, this issue is not properly before us and thus decline to decide it.

▪ "Whether or not a cross-appeal must be taken depends upon whether the issues the appellee seeks to raise constitute an attack on the judgment below ... or are merely alternative arguments in support of the judgment...." 9 *Moore's Federal Practice* ¶ 204.11[3], at 4–48 (2d ed.1991). A cross-appeal is unnecessary when an appellee endeavors to affirm a judgment in its favor by proffering an alternative theory in support of the district court's decision. *See Colautti v. Franklin*, 439 U.S. 379, 397 n. 16, 99 S.Ct. 675, 686 n. 16, 58 L.Ed.2d 596 (1979) ("Appellees, as the prevailing parties, may of course assert any ground in support of that judgment, 'whether or not that ground was relied upon or even considered by the trial court.'" (quoting *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970))).[74] If, however, an appellee aspires to alter the trial court's decision (either increasing its rights or decreasing those of its opponent), a cross-appeal is required. *See Airco Industrial Gases, Inc. v. Teamsters Health & Welfare Pension Fund of Philadelphia & Vicinity*, 850 F.2d 1028 (3d Cir.1988).[75]

---

denied, — U.S. ——, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990).

**72.** The court's order, dated November 2, 1987, provides:

For the reasons stated in the Court's Memorandum Opinion entered in this case on this date, it is

ORDERED AND ADJUDGED:

1. The motion for summary judgment on the issues of: (a) the pollution exclusion clause, and (b) coverage for injunctive relief, submitted by Aetna Casualty and Surety Co., National Union Fire Insurance Co., Home Insurance Co., Twin City Fire Insurance Co., Insurance Company of North America, United States Fire Insurance Co., and Continental Casualty Co., against the plaintiff, New Castle County, is hereby denied.

2. The United States Liability Insurance Company's motion for summary judgment on the basis of the pollution exclusion clause against the plaintiff, New Castle County, is hereby granted regarding its policies issued to the plaintiff from July 1, 1975 to July 1, 1978, but its motion for summary judgment against the plaintiff regarding policies issued to the plaintiff prior to July 1, 1975, is hereby denied.

**73.** This holding is consistent with the pretrial statement prepared and filed on May 25, 1989, by counsel for CNA and the County. This statement, which was approved by the district court, provides that: "All cross-claims have been preserved by a stipulation between the parties dated February 10, 1986." App. at 3376.

**74.** *See also Fairview Township, York County v. United States Environmental Protection Agency*, 773 F.2d 517, 525 n. 15 (3d Cir.1985) ("It is well settled that 'we [can] affirm the district court on any basis which finds support in the record.'" (citations omitted)).

**75.** In *Airco*, we held that:

It is well-settled that "[w]hat [an appellee] may not do in the absence of a cross appeal is to 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary....' Th[is] rule is inveterate and certain." *Morley Construction Co. v. Maryland Casualty Co.*, 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937) (*quoting United States v. American Railway Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924)).

850 F.2d at 1034.

The district court, in its January 8th Order, dismissed CNA's cross-claims *without* prejudice on the ground that they were untimely. On appeal, the Carrier Appellees do not seek a straight affirmance of that order, nor do they simply advocate an alternative ground for affirmance. They instead ask us to "remand to the district court for entry of an order dismissing CNA's cross-claims *with* prejudice"—a decision that would enlarge the rights afforded them by the January 8th Order. Were we to hold that the Carrier Appellees' settlements bar CNA's claims for contribution, that decision, unlike the district court's, would constitute a judgment on the *merits:* it would be a determination that CNA has no cause of action as a matter of law, resulting in a dismissal with prejudice. Absent a cross-appeal, however, the Carrier Appellees may not obtain more extensive relief on appeal than they received in the district court.

The Eighth Circuit was confronted with an analogous situation in *Benson v. Armontrout*, 767 F.2d 454 (8th Cir.1985). The district court in *Benson* had dismissed without prejudice a petition for writ of habeas corpus, reasoning that it lacked jurisdiction to consider the petition. *Id.* at 455. The State, without filing a cross-appeal, urged the court of appeals to go beyond the jurisdictional issue and address the merits of the petition. The *Benson* court, however, declined the invitation, holding that the State was precluded from obtaining a dismissal with prejudice:

> [T]he effect of [the State's proposed] disposition would be to dismiss the habeas petition with prejudice.... The District Court's decision, being grounded on its own lack of jurisdiction because of the putative pendency of an appeal, was without prejudice. The State (or, more properly, the respondent custodian of Benson's body), as an appellee that has not filed a cross-appeal, may urge any ground that would result in an affirmance of the judgment below in its favor, but it may not obtain from us relief more extensive than it received in the District Court.

*Id.* Likewise, in the absence of a cross-appeal, we decline to consider the "settlement bar" issue advanced by the Carrier Appellees here.[76]

**76.** Essentially conceding that they seek to expand the relief accorded them by the January 8th Order, the Carrier Appellees assert that our rule requiring a cross-appeal is not absolute. The Carrier Appellees contend that, even if a cross-appeal was called for as a technical matter, we still have discretion to modify the district court's judgment so long as their arguments are supported by the record. The Carrier Appellees identify three Third Circuit cases that purportedly support this proposition. *See Rhoads v. Ford Motor Co.*, 514 F.2d 931, 934 (3d Cir.1975); *Scott v. University of Delaware*, 601 F.2d 76, 82–84 (3d Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Lucas v. Gulf & Western Industries, Inc.*, 666 F.2d 800, 805 (3d Cir.1981). We read these cases differently than do the Appellee Carriers.

We think that *Rhoads* is clearly distinguishable from the instant case, because the appellee in *Rhoads* simply asserted an alternative theory in support of the district court's decision. As a result, we held that a cross-appeal was unnecessary, although the appellee's reasoning was "inconsistent with that of the [district] court." 514 F.2d at 934.

The distinction between this case and *Scott* and *Lucas* is a bit more subtle. In both *Scott* and *Lucas*, the appellee sought to modify the district court's judgment without filing a cross-appeal. In *Scott*, an appellee, who had prevailed on the merits in a class action, asserted on appeal that the district court erred in certifying the class. Similarly, the appellee in *Lucas*, despite prevailing on the merits in the district court, argued on appeal that the district court lacked jurisdiction. In both cases, we held that a cross-appeal was not needed, because neither appellee sought to enlarge its rights or diminish those of its adversary:

> Since the [appellee] prevailed upon the merits of the class claims in the district court its attack upon the class certification on appeal will not enlarge its own rights or lessen those of its adversary. Rather, our conclusion that the class was improperly certified will cause the [appellee] to forfeit whatever preclusion effects it may have derived from the district court's judgment on the class claims. This fact, as well as the party structure of the lawsuit, makes it appropriate for us to review the district court's class certification despite the absence of a cross-appeal.

*Scott*, 601 F.2d at 82–83 n. 12; *see also Lucas*, 666 F.2d at 805 (noting that appellee's judgment on the merits, if affirmed, would have preclusive effect, whereas a ruling that the district court lacked jurisdiction would not). The Carrier Appellees, in contrast, urge us to vacate the district court's order dismissing CNA's cross-claims without prejudice and to remand the

## VI. CONCLUSION

For the foregoing reasons, we will dismiss appeals number 89–3814 and 90–3012. With respect to appeal number 90–3030, we will affirm the district court's order insofar as it holds that coverage is not barred by the insurance policies' "as damages" clause, and that there were covered "occurrences" during each of CNA's policy periods. We will reverse the district court's order, however, insofar as it holds that coverage is not barred by the insurance policies' "pollution exclusion" clause, and that CNA's cross-claims were untimely under the parties' February 1986 Stipulation. We will remand this case to the district court for further proceedings consistent with this opinion. The district court on remand should determine whether the County expected Tybouts Corner landfill to discharge or release contaminants into or upon the land, or any watercourse or body of water. The parties shall bear their own costs.

case with instructions to dismiss those claims with prejudice. If we were to enter such an order, it clearly would enlarge the rights afforded the Appellee Carriers under the district court's order. We therefore find *Scott* and *Lucas* to be inapposite.